## Commonwealth vs. Brian Auclair

Middlesex. February 11, 2005. - May 26, 2005.

Present: Marshall, C.J., Greaney, Ireland, Spina, & Cordy, JJ.

*Homicide. Evidence,* Voluntariness of statement, Polygraph test, Inflammatory evidence, Consciousness of guilt. *Practice, Criminal,* Voluntariness of statement, Argument by prosecutor, Postconviction relief, Verdict. *Due Process of Law,* Assistance of counsel.

The judge in a murder case properly denied the criminal defendant's motion to suppress statements he made to police, where the statements the defendant made following a previously agreed-to polygraph examination did not result from police trickery [354]; where the defendant's statements were voluntarily made while he was alert and fully oriented and understood what he was doing, and followed repeated issuance of Miranda warnings [354-356]; and where the defendant's statement concerning hiring an attorney did not amount to an affirmative request for an attorney [356-357].

At a murder trial, the judge did not abuse his discretion in denying the defendant's request for a mistrial based on the judge's failure to give a curative instruction concerning a statement that the judge agreed to strike from the record at the defendant's urging, given that the judge previously had instructed the jury that they should not allow any answer or portion of an answer that the judge had asked them to disregard to form the basis of any part of their fact finding in the case. [357-358]

Statements made by the prosecutor at a murder trial, even if improper, did not constitute prejudicial harm requiring a new trial, in light of the judge's clear and specific instruction to the jury correcting these statements, coupled with the medical evidence and the defendant's own statement. [358-360]

There was no merit to the argument that the judge at a murder trial erred in failing to give an instruction prohibiting the jury from considering evidence of consciousness of guilt in determining extreme atrocity or cruelty. [360-361]

The judge at a murder trial committed an error of law in reducing the verdict from murder in the first degree to murder in the second degree, based on his determination that there was insufficient evidence to support the verdict of murder in the first degree on the theory of extreme atrocity or cruelty, where the jury had ample evidence to find that one or more of the factors listed in *Commonwealth* v. *Cunneen,* 389 Mass. 216 (1983), were present. [361-364]

This court declined to exercise its power under G. L. c. 278, § 33E, to reduce a verdict of murder in the first degree on a theory of extreme atrocity or cruelty to murder in the second degree, where none of the factors that have justified a reduction in verdict in other cases were present. [364-365]

INDICTMENT found and returned in the Superior Court Department on February 28, 2000.

A pretrial motion to suppress evidence was heard by *Raymond J. Brassard,* J.; the case was tried before *Paul A. Chernoff,* J., and a motion for postconviction relief was heard by him.

*Richard J. Shea* for the defendant.

*Loretta M. Lillios,* Assistant District Attorney (*Kevin L. Ryle,* Assistant District Attorney, with her) for the Commonwealth.

IRELAND, J. A Superior Court jury found the defendant guilty of murder in the first degree on a theory of extreme atrocity or cruelty in the death of the victim, a three and one-half month old infant girl. The defendant filed a motion for postverdict relief pursuant to Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979), asking, inter alia, for a reduction in the verdict. The trial judge, stating that there was insufficient evidence to support the verdict of murder in the first degree, granted the motion and reduced the verdict to murder in the second degree. The Commonwealth appeals from the judge's granting of the defendant's motion, pursuant to Mass. R. Crim. P. 25 (c) (1), 378 Mass. 896 (1979), arguing that the judge committed an error of law. The defendant also appeals, claiming that the judge erred in denying his motion to suppress certain of his statements and in denying his motion for a mistrial. He also claims that part of the prosecutor's closing argument contained prejudicial statements requiring reversal of his conviction. He further asks us to articulate a rule that consciousness of guilt cannot be used as evidence of extreme atrocity or cruelty. We conclude that the judge erred in reducing the verdict. We also conclude that the defendant's claims of error do not require reversal of his conviction and see no reason to exercise our power pursuant to G. L. c. 278, § 33E. Accordingly, we reinstate the defendant's conviction of murder in the first degree.

1. *Facts.* We recite the facts the jury were warranted in finding, reserving certain details for our discussion of the issues.

On December 24, 1999, the defendant, his girl friend, and the victim, who was the girl friend's three and one-half month old infant daughter, attended a party in Lowell at the home of the defendant's mother and stepfather. Approximately thirty people,

including several children, attended the party. The victim was very popular with the party guests, and spent some of the evening being passed around from guest to guest. She was alert and did not appear ill.

At some point the defendant was holding the victim and she fell asleep in his arms. He took the victim upstairs and placed her on his mother's bed. Although the defendant had been drinking, he did not appear drunk.

While the defendant was in the bedroom with the victim, the defendant's cousin, an eight and one-half year old girl, heard the victim crying. As the defendant was leaving the bedroom, the cousin asked if she should check on the victim; the defendant told her that she did not have to. This cousin testified at trial that she later heard the victim whining.

The defendant stayed at the party for another five hours. During the party, the victim's mother, the defendant's sister, and his mother each peeked into the room to check on the victim. She appeared to be sleeping.

At approximately 1:30 A.M. on December 25, the defendant's sister went upstairs to get the victim because the defendant and the victim's mother were leaving. She noticed bruising on the victim's eye and that the victim was gasping for breath. The defendant's sister started yelling to family members, carried the victim downstairs, set her down, and dialed 911. While waiting for paramedics to arrive, family members were speculating about the cause of the injuries, including that someone may have dropped the victim. At that time, the defendant stated that the victim "wouldn't have gotten that from being dropped . . . she was punched or hit with something."

The victim was taken to Lowell General Hospital, after which she was taken by helicopter to Massachusetts General Hospital in Boston. She had bruising near her eye and on her head. Doctors employed heroic measures to save her, including intubation, ventilation, and catheterization, but her condition continued to deteriorate. She died on December 26 of severe blunt head trauma.

An autopsy revealed that a triangular fragment of bone marked the point of impact on her skull, creating a complex fracture from which several lines of fracture radiated. There

was bleeding throughout the entire brain and such severe swelling that it caused the radiating fractures to widen. Excessive fluid from the swelling also leaked out through the base of the brain into the spinal cord.[1] These injuries were consistent with the victim's head being hit against the corner of a piece of the bedroom furniture, such as a bureau, with tremendous force. The victim also had severe retinal bleeding in both eyes, indicative of a violent shaking.[2]

The victim's injuries were not consistent with an accidental fall, nor could a five year old child have caused the injury.[3] By the time the victim arrived at the hospital she probably was not conscious of pain, but it is possible that she felt pain before that time.[4] However, at one point in the emergency room she did respond to painful stimuli.

As part of their investigation, police interviewed guests at the party, including the defendant. During an interview on

---

[1]At one point before her death, the victim's intercranial pressure ranged from fifty-eight to ninety-five millimeters of mercury. Normal pressure ranges from six to eight millimeters of mercury.

[2]Some experts testified that it was possible that a severe impact alone could have caused bleeding in both eyes. As an example of the force necessary to cause the level of retinal bleeding in the victim's eyes, the experts testified that it was equivalent to a baby in a carriage that was hit by a truck and thrown fifty feet. One expert likened the blow that was necessary to cause bleeding in both eyes to an eleven month old baby falling down concrete steps.

[3]The defendant did not testify at trial, but his defense included his (eventual) claim to police that he tripped and fell with the victim, accidentally bumping her head (discussed *infra*). His defense also included the theory that someone else at the party that night, including other adults and two five year old children, could have hurt the victim. Concerning the children, the jury heard evidence that at one point, one five year old girl picked up the victim, but an adult saw her return the victim safely to the bed. Moreover, the defendant's five year old niece apparently told police that she lifted the victim off the bed and, when hoisting the victim on her shoulder, may have backed into a piece of furniture and bumped the victim's head. Police had the defendant's niece reenact her actions in the bedroom. The jury were given a sanitized version of the defendant's statements to police, in which he stated that he was confessing, in part, because his "five year old niece [had to] go through all this bullshit," and because he did not want to involve his little cousin.

[4]The autopsy also revealed that some of the victim's ribs had been fractured two to four weeks earlier and showed signs of healing. There was no evidence as to who caused this injury.

December 25,[5] the defendant recounted his activities of December 24, including his putting the victim to sleep on his mother's bed. He claimed that everything was fine with the victim. His statement to police was reduced to writing, which the defendant edited and signed. As the investigation continued, information gathered from other witnesses focused police attention on the defendant and his sister as the last two individuals who had seen the victim before she was laid on the bed.

The defendant and his sister agreed to take polygraph examinations.[6] Police arranged for a polygraph examiner with the State police of New Hampshire to be present on December 28. Without revealing this fact to the defendant, the police went to the defendant's apartment and asked him whether he would be willing to go with them to the district attorney's office for more questioning.[7] He agreed. On arrival, the detectives told him there was a polygraph examiner in another room. The defendant agreed to be tested. Approximately three hours later, after the test had been completed and scored, the examiner told the defendant that he did not believe the defendant was being truthful. The defendant cried and stated that he had hurt the victim, but that it was an accident.

Although the information concerning the polygraph examination was kept from the jury, they did hear that at some point the defendant confessed. Between approximately 8:13 P.M. and 10:40 P.M., the defendant was interviewed by police four separate times, for a total of approximately forty-five minutes. He took responsibility for hurting the victim, but claimed it was an accident; he stated that he had tripped on an area rug in his mother's bedroom and had bumped the victim's head on a wooden sideboard on the bed and that, although she cried, the

---

[5]The defendant received and waived his Miranda rights not only at this time, but also several times over the course of his interviews with police.

[6]In Massachusetts, polygraph evidence is inadmissible for any purpose in a criminal trial. *Commonwealth* v. *Martinez*, 437 Mass. 84, 88 (2002), and cases cited. Therefore, the jury was not presented with this information. We include it as context for our analysis of the defendant's appeal from the denial of his motion to suppress statements he made to police.

[7]At this time, other officers were bringing the defendant's sister to the office for the same purpose. When it became clear that the defendant's polygraph examination was going to take at least two hours, police took his sister home, instead of having her wait to be interviewed.

victim seemed unharmed.[8] He stated that he never lost his grip on the victim. He put a pacifier in her mouth and went downstairs to the party. He stated that he was "scared" and that was why he told his cousin, who had heard the victim crying, not to check on the victim. He also expressed relief at telling the police his version of events. The detectives told the defendant that his story was not consistent with the evidence of the severity of the victim's injuries, but the defendant stuck to his story, which ultimately became part of the defense theory at trial. However, when allowed to make a telephone call from the district attorney's office, a detective overheard the defendant crying into the telephone to his sister, "I did it . . . I killed her."

The defendant did not testify. His defense was that someone else caused the injuries. See note 3, *supra*. He also introduced evidence that he had a reputation in the community as someone who was gentle and who would never harm a child.

The jury were instructed on murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty, murder in the second degree murder, and involuntary manslaughter.

2. *The defendant's appeal.* a. *Motion to suppress.* Before trial, the defendant filed a motion to suppress statements he made to police, arguing that his waiver of his Miranda rights was not made knowingly, intelligently, and voluntarily, and that his statements to police were not voluntary. The Commonwealth bears the burden of proving beyond a reasonable doubt, in the totality of the circumstances, that a defendant's waiver was voluntary, knowing, and intelligent, and that his statements were voluntary. See *Commonwealth* v. *Jackson*, 432 Mass. 82, 85-86 (2000).

Absent clear error, we accept a motion judge's findings of fact, *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990), and a finding of voluntary waiver is given substantial deference. *Commonwealth* v. *Tavares*, 385 Mass. 140, 145, cert. denied,

---

[8]Police found that the bed had no wooden sideboard and the defendant insisted that he did not hit the victim's head elsewhere on the bed. Moreover, quilts hung over the side of the bed where the defendant claimed the victim's head had struck.

457 U.S. 1137 (1982). The motion judge not only heard testimony at the motion hearing, but he also had access to transcripts and recordings of most of the defendant's statements. On appeal, the defendant does not claim that any of the motion judge's factual findings are incorrect, but argues that the motion judge erred in applying the law to several circumstances surrounding his statements to police. We consider each of the defendant's claims of error.

(1) *Polygraph examination.* When detectives went to the defendant's apartment on December 28 and asked him whether he would accompany them to the district attorney's office to answer more questions, they said nothing regarding polygraph examiners. The defendant argues, as he did in his motion to suppress, that this was trickery, and therefore, his inculpatory statements should have been suppressed. Cf. *Commonwealth* v. *Selby*, 420 Mass. 656, 663-664 (1995) (ruse alone not enough to show involuntariness of defendant's statement).

The motion judge found that the defendant had agreed to take a polygraph examination some time prior to December 28. When he was asked specifically on December 28 if he would take the examination, he agreed. Moreover, the polygraph examiner recited the Miranda warnings, and the defendant waived his rights. *Commonwealth* v. *Medeiros*, 395 Mass. 336, 348-349 (1985) (no coercion where defendant took polygraph examination willingly and was told by examiner that in his opinion defendant was not telling truth). The defendant presented no evidence that he was subject to oppressive testing or interrogation conditions, physical abuse, bribes, or threats by police. *Id.* at 349. In fact, during later interviews with police, the defendant offered to take another test. There was no error.

(2) *Defendant's mental state.* The defendant also argues that his low intelligence, borderline personality disorder, and emotional reaction to being told he failed the polygraph examination and that the examiner did not believe his story rendered the repeated waiver of his Miranda rights invalid and made his postwaiver statements to police involuntary. He also argues for the first time on appeal that the three hours it took to administer and score the polygraph may have overcome his "weakened will." Statements made by a defendant with low

intelligence in a debilitated mental condition may render the statements involuntary only if the statements are affected by that condition. See *Commonwealth* v. *Benoit,* 410 Mass. 506, 511, 515 (1991), quoting *Commonwealth* v. *Vazquez,* 387 Mass. 96, 100 (1982) (admissions of psychotic defendant admissible where admissions "not substantially related to the effects of psychosis"); *Commonwealth* v. *Medeiros, supra* at 348, citing *Commonwealth* v. *Cameron,* 385 Mass. 660, 665 (1982) (confession voluntary where police did not take advantage of defendant's low intelligence to coerce or trick him into waiving rights).

Here, the motion judge's finding that the repeated issuance of Miranda warnings coupled with the fact that the defendant was alert and fully oriented, and that he understood what he was doing, is fully supported in the record. Both expert witnesses testified that the defendant's IQ was eighty-two, indicating that his intelligence fell on the low side of normal. The record supports the motion judge's findings that the defendant's own expert admitted on cross-examination that the defendant "(1) understood the consequences of speaking to the police, (2) denied any intentional wrongdoing, and (3) 'stuck with his story,' some indication that [the defendant's] will was not overborne by the police." The motion judge credited the Commonwealth's expert, who testified that the defendant does not suffer from a mental illness. The motion judge found that the defendant was emotionally upset at times during his statement to police. However, emotional upset alone does not render a waiver of Miranda rights or the voluntariness of the statement itself invalid where there is no evidence that the defendant was acting irrationally. *Commonwealth* v. *LeBlanc,* 433 Mass. 549, 555 (2001), and cases cited (statement voluntary where emotionally upset defendant spoke calmly and where there was no evidence that he was acting irrationally). There was no error.

The defendant argues that the police interrogation that followed the polygraph examination may have overcome his "weakened will." The Commonwealth argues that this argument was not raised below and thus it is waived. See *Commonwealth* v. *Barnes,* 399 Mass. 385, 393-394 (1987). We need not discuss the issue of waiver because the argument has no

merit. Although the motion judge did not discuss this issue directly, in considering the totality of circumstances of the defendant's waiver of his Miranda rights and the voluntariness of his statements to police, the judge did discuss the length of time of each interview and the fact that the defendant twice offered to take another polygraph examination.

(3) *Defendant's statement concerning an attorney.* During one interview with police on December 28, police told the defendant that, based on autopsy results, the victim's injuries could not have been caused by the accident the defendant described. The defendant responded: "Well, that's the way I'm telling you, and if you don't believe that, you can do whatever you want and go proceed with it. I'm not trying to make this any harder. It's hard on me as it is. That's my story. *I'll get a lawyer.* That's my story." (Emphasis added.) The police continued to question the defendant. There was no other mention of an attorney, and the defendant later offered to take another polygraph examination. The defendant claims that the judge erred in concluding that the defendant's statement, "I'll get a lawyer," was not an affirmative request for an attorney but rather an "acknowledgment that the police suspected that he was lying, and that the charges against him were becoming more serious."

Although further interrogation must cease if a defendant affirmatively requests an attorney, *Commonwealth* v. *Brant*, 380 Mass. 876, 882, cert. denied, 449 U.S. 1004 (1980), "[i]nvocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' " *Commonwealth* v. *Judge*, 420 Mass. 433, 450 (1995), quoting *Davis* v. *United States*, 512 U.S. 452, 459 (1994). See *Commonwealth* v. *Contos*, 435 Mass. 19, 28-29 (2001) (defendant's statement, "I think we're going to stop, and I think I'm going to get a lawyer," unequivocal request for attorney).

Here, the motion judge, who had benefit of listening to recordings of the defendant's statements, concluded that the statement did not amount to an affirmative request for an attorney. His conclusion is supported by our case law holding that similar statements were not an affirmative request for an attorney. See,

e.g., *Commonwealth* v. *Todd*, 408 Mass. 724, 726 (1990) (defendant "wondered aloud" about advisability of having lawyer); *Commonwealth* v. *Corriveau*, 396 Mass. 319, 331-332 (1985) ("It's beginning to sound like I need a lawyer"); *Commonwealth* v. *Pennellatore*, 392 Mass. 382, 387 (1984) ("I guess I'll have to have a lawyer for this"). There was no error.

b. *Denial of motion for mistrial.* At trial a pediatric surgeon at Massachusetts General Hospital who attended to the victim testified that when the medical team decided to withdraw life support from the victim, "Support was withdrawn and the mother was allowed to hold the baby in her arms." Defense counsel objected and moved to strike. The judge stated: "Yes, I'm going to strike that."

At a sidebar conference, defense counsel moved for a mistrial, arguing that the testimony was not relevant and was inflammatory. The judge denied the motion. The defendant did not request a further curative instruction.[9]

The defendant argues that the judge abused his discretion in denying his motion because the statement inflamed the jury, helping to "tip the scales" against the defendant where, he argues, the issue was whether he caused the victim's injuries intentionally or accidentally. He further argues that although the judge did strike the statement, the judge issued no curative instruction, and therefore, the judge's response did not neutralize the inflammatory effect of the statement.

Declaration of a mistrial is in the discretion of the trial judge. *Commonwealth* v. *Kilburn*, 426 Mass. 31, 37 (1997). "Where a party seeks a mistrial in response to the jury's exposure to inadmissible evidence, the judge may rely on curative instructions to correct any error and to remedy any prejudice . . . [a]s long as the judge's instructions are prompt and the jury do not again hear the inadmissible evidence, as here, a mistrial is unnecessary." *Commonwealth* v. *Garrey*, 436 Mass. 422, 435 (2002), and cases cited.

In this case, the judge previously had instructed the jury that, should he ask them to disregard an answer or portion of an

---

[9]The judge stated that he would reiterate to the jury that when he sustains an objection, they are not to consider the question or answer. The judge did not reiterate this instruction.

answer, then that answer or portion of an answer should "not form the basis of any part of your fact finding in this case." Jurors are presumed to follow a judge's clear instructions and disregard the testimony. *Commonwealth* v. *Qualls*, 440 Mass. 576, 584 (2003). *Commonwealth* v. *Helfant*, 398 Mass. 214, 228-229 (1986), and cases cited. There was no abuse of discretion.

c. *Prosecutor's closing.* The defendant argues that during closing argument, the prosecutor twice argued that medical experts determined that the victim was murdered, thus prejudicing the defendant and requiring a reversal of his conviction. We consider a prosecutor's closing in the context of the entire argument, the evidence, and the judge's instructions. *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 746 (1990), and cases cited. Accordingly, we set out each statement by the prosecutor, as well as the judge's instructions to the jury, and then consider whether there was error.

During closing argument, the prosecutor stated:

> "The doctors came in one after another, and told you, based on what they saw, what they did, and their opinions as to what happened to [the victim]. And what happened isn't an accident, what happened was murder, murder with extreme atrocity and cruelty and deliberate premeditation."

There was no objection to this argument.

Later, the prosecutor stated:

> "All of the Commonwealth's witnesses were professionals trying to do their jobs to the best of their ability based on their training, their experience, the doctors, the review of the literature in the field, and they all came to the conclusion, that this was murder, not an accident."

Defense counsel objected to this statement.

In his instructions to the jury, the judge stated:

> "Now, the prosecutor in his closing argument stated to you, and remembered something which I don't believe that you'll remember because I don't think that was the evidence. The doctors, no doctor in this case testified that there was, that the injuries in this case were consistent

with murder, or that there was a murder. The only things that the doctors testified to was whether or not injuries in this case were consistent with accident or no accident. And so you may consider that."

The judge also told the jury that what attorneys argue in opening and closing arguments is not evidence, and even if the attorney is suggesting the direction of the facts, it was their recollection of the evidence that controlled. He instructed them on "accident" and provided a written list of each element of each possible verdict.

We begin with the prosecutor's first statement: "And what happened isn't an accident, what happened was murder, murder with extreme atrocity and cruelty and deliberate premeditation." The propriety of this statement presents a very close question, but we conclude that it was not improper. Prosecutors are entitled to argue theories supported by evidence and reasonable, possible inferences from the evidence. See *Commonwealth* v. *Christian*, 430 Mass. 552, 564-565 (2000); *Commonwealth* v. *Dinkins*, 415 Mass. 715, 725 (1993); *Commonwealth* v. *Kozec*, 399 Mass. 514, 516 (1987). Here, the prosecutor accurately stated that the doctors testified as to what happened. He then could argue that the jury reasonably could infer from this testimony that what happened was murder and not an accident. The absence of an objection from defense counsel lends support to our conclusion that this statement was not improper. See generally *Commonwealth* v. *Raymond*, 424 Mass. 382, 392 (1997).

Turning to the prosecutor's second statement, "and they all came to the conclusion, that this was murder, not an accident," this clearly was an improper statement. The Commonwealth argues that in the context of the prosecutor's argument that none of the "professionals" had motive to lie, the statement was a permissible inference from the evidence. We disagree. The prosecutor clearly stated that all of the Commonwealth's "professionals" concluded that it was "murder," something they did not do and would not be allowed to do. All five of the medical experts testified that the injuries were inconsistent with an accident, including the version of events the defendant described to police. They did not testify that the child had been murdered.

However, even if we were to consider that the prosecutor's first statement was improper, for the reasons stated below, we nevertheless conclude that the prosecutor's two statements, taken together, did not constitute prejudicial harm requiring a new trial.

The judge's specific instruction to the jury corrected these very statements in the prosecutor's closing, by telling them that no expert testified that the victim was murdered and that they could only consider the medical experts' opinions that the injuries were consistent or inconsistent with accident. Juries are presumed to follow such instructions. See *Commonwealth* v. *Qualls, supra; Commonwealth* v. *Helfant, supra.* Through the judge's instructions on accident, the theories and degrees of murder, and involuntary manslaughter, the jury would have understood that it was for them to determine whether the victim's injuries were accident or murder. We are confident that the prosecutor's statements did not make a difference in the jury's conclusion, given the judge's clear and specific instruction coupled with the medical evidence concerning the extent of the victim's injuries and the defendant's own statement that the victim did not receive her injuries by being dropped. *Commonwealth* v. *Arroyo*, 442 Mass. 135, 147 (2004) (factors court considers when defendant claims error in prosecutor's closing).

d. *Consciousness of guilt.* In his instructions to the jury on deliberate premeditation, the judge explicitly stated that evidence of consciousness of guilt should not be considered in determining malice aforethought. The defendant argues that the absence of a similar instruction concerning their determination of extreme atrocity or cruelty "might have been understood by the jury implicitly to permit [their] consideration" on extreme atrocity or cruelty. There was no objection at trial and the defendant does not argue that the specific instructions were erroneous.

This argument has no merit. The defendant was not entitled to the specific prohibition concerning malice aforethought. There is no blanket prohibition on use of consciousness of guilt to infer premeditation. *Commonwealth* v. *Dagenais*, 437 Mass. 832, 844 n.9 (2002). Where the judge correctly instructs on consciousness of guilt and malice aforethought, a further in-

struction on the use of consciousness of guilt regarding premeditation is not necessary. See *id.* at 843-844. The defendant has not argued or shown that the judge did not adequately alert the jury to the differences between the two concepts or instruct incorrectly on malice aforethought in the context of extreme atrocity or cruelty. *Commonwealth* v. *Chaleumphong*, 434 Mass. 70, 78-79 (2001), citing *Commonwealth* v. *Cohen*, 412 Mass. 375, 392-393 (1992). Moreover, lying as evidence of consciousness of guilt has supported conviction based on the theory of extreme atrocity or cruelty. See *Commonwealth* v. *Torres*, 442 Mass. 554, 565-566 & n.9 (2004) (evidence supported conviction of murder in first degree on theory of extreme atrocity or cruelty where defendant invented story completely at odds with medical evidence to cover up his own culpability). There was no error.

3. *The Commonwealth's appeal.* The Commonwealth appeals from the judge's decision to grant the defendant's motion for postverdict relief and reduction of the verdict to murder in the second degree based on insufficient evidence. The judge specifically stated that he did not reduce the verdict pursuant to his power to grant extraordinary relief under rule 25 (b) (2). Cf. *Commonwealth* v. *Lyons, ante* 289, 291-297 (2005) (judge abused her discretion in exercising extraordinary relief pursuant to rule 25 [b] [2], based on principles of justice). Moreover, he concluded that the evidence did not compel a conclusion that the defendant should be found guilty of involuntary manslaughter. He also rejected as "unpersuasive" the "other issues raised by counsel, including inter alia, the lack of motive, deficiency in the scientific evidence, evidence of the access of others, and the government's closing argument."

Concerning the evidence of extreme atrocity or cruelty, the judge concluded that the first three elements (the defendant killed the victim, the killing was unexcused, and the defendant acted with third prong malice) were proved beyond a reasonable doubt. See *Commonwealth* v. *Vizcarrondo*, 427 Mass. 392, 394-395 n.3 (1998), *S.C.*, 431 Mass. 360 (2000), quoting *Commonwealth* v. *Sneed*, 413 Mass. 387, 388 n.1 (1992) (defining third prong malice as "in the circumstances known to the defendant, a reasonably prudent person would have known that,

according to common experience, there was a plain and strong likelihood that death would follow the contemplated act"). The judge addressed the seven factors listed in *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983) (*Cunneen* factors): (1) indifference to and taking pleasure in the victim's suffering; (2) consciousness and degree of suffering of the victim; (3) extent of physical injuries to the victim; (4) the number of blows delivered by the defendant to the victim; (5) the manner and degree of force with which the blows were delivered to the victim; (6) the instrument or weapon employed by the defendant; and (7) the disproportion between the means needed to cause death and those employed. He noted that the jury needed to find only one factor to support a guilty verdict based on extreme atrocity or cruelty. *Commonwealth* v. *Hunter*, 416 Mass. 831, 837 (1994), *S.C.*, 427 Mass. 651 (1998). However, he concluded that although "[t]here may be a theoretical basis for finding the presence of the third and possibly the fifth factor, . . . it seems . . . that the extent and presence of these two factors are *inadequate to drive a verdict of [f]irst [d]egree [m]urder*, especially since their absence would still compel a finding of [s]econd [d]egree [m]urder" (emphasis added). The judge also stated that his conclusion was in keeping with legal precedent, citing *Commonwealth* v. *Cadwell*, 374 Mass. 308, 310, 317-318 (1978) (reducing verdict to murder in second degree where evidence showed that fatal injuries to victim's head were caused by defendant's hand, defendant had engaged in misguided attempt to discipline child, and his uncontrolled outbursts were inconsistent with deliberate premeditation), and *Commonwealth* v. *Avellar*, 416 Mass. 409, 413-414, 422 (1994) (upholding conviction of murder in first degree by extreme atrocity or cruelty where there was evidence of repeated blows to infant's head and numerous other injuries to body).

The authority of a trial judge to reduce a verdict is much like this court's authority pursuant to G. L. c. 278, § 33E. *Commonwealth* v. *Woodward*, 427 Mass. 659, 666 (1998), and cases cited. In reviewing a judge's exercise of authority under rule 25 (b) (2) "we consider only whether the judge abused his discretion or committed an error of law." *Id.* at 668, quoting *Commonwealth* v. *Millyan*, 399 Mass. 171, 188 (1987).

The defendant argues that despite the assertion to the contrary, the judge was exercising his extraordinary power under rule 25 (b) (2), based on principles of justice, and therefore, we need only consider whether the judge abused his discretion in reducing the verdict. Cf. *Commonwealth* v. *Lyons, supra* (judge abused her discretion in exercising extraordinary relief pursuant to rule 25 (b) (2), based on principles of justice). We disagree. The judge specifically stated that he was reducing the verdict because there was insufficient evidence to uphold the verdict. The judge's assessment followed the standard set out by *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979), for reviewing motions for directed verdict under rule 25 (b) (2) ("whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"). Therefore we must determine whether, as the Commonwealth argues, the judge made an error of law in assessing the sufficiency of the evidence. However, because this is a capital case, we will consider the entire case in light of our power pursuant G. L. c. 278, § 33E, to determine whether there is any reason to affirm the reduction in the verdict. Contrast *Commonwealth* v. *Woodward, supra* at 668, citing *Commonwealth* v. *Gaulden*, 383 Mass. 543, 557 (1981) (abuse of discretion standard).

We conclude that the judge made an error of law when he determined that there was insufficient evidence to support the verdict of murder in the first degree on the theory of extreme atrocity or cruelty. *Commonwealth* v. *Latimore, supra.* Here, the jury heard evidence that the victim had both severe retinal bleeding and a complex fracture of her skull. They could have concluded that the defendant either violently shook and then slammed the victim's head into the corner of a piece of bedroom furniture, or slammed her head so hard it had the force of being hit by a truck and thrown fifty feet. The injuries were described as massive and catastrophic. The victim's brain swelled and subjected her to tremendous intercranial pressure whereby some of the fluid leaked into her spinal column. In addition, the defendant, knowing what he had done, left the victim

in the bedroom for several hours and discouraged his cousin from checking on the victim, whom the cousin heard crying, because he was "scared." The defendant did not alert anyone or call for emergency services even though he told police that the victim was crying when he left the bedroom. When the victim was found, she was gasping for breath. Here, just as the judge concluded, a reasonable jury could have found that the defendant unlawfully killed the victim with so-called third prong malice "because the tremendous amount of force intentionally brought to bear on the skull of the child would have led a reasonably prudent person to conclude that there was a plain likelihood that death would follow that act." See *Commonwealth v. Vizcarrondo*, 427 Mass. 392, 394 n.3 (1998). Given these facts, however, we disagree with the judge's conclusion that there was only "theoretical" evidence of one or more of the *Cunneen* factors. Viewed in the light most favorable to the Commonwealth, the jury had ample evidence to find that one or more of the *Cunneen* factors were present (e.g., indifference to the victim's suffering, extent of the victim's injuries, or the manner and degree of force with which the blow[s] were delivered).[10] See *Commonwealth* v. *Boateng*, 438 Mass. 498, 511 (2003), and cases cited (even single blow to infant consistent with extreme atrocity or cruelty); *Commonwealth* v. *Garabedian*, 399 Mass. 304, 311 (1987) (suffering of victim not required for extreme atrocity or cruelty); *Commonwealth* v. *Podlaski*, 377 Mass. 339, 348 (1979) (consciousness of victim not required for extreme atrocity or cruelty). Accordingly, it was error for the judge to reduce the verdict because there was sufficient evidence to sustain the conviction.

4. *Review under G. L. c. 278, § 33E.* We have reviewed the entire case to determine whether the verdict is against the law or weight of evidence or for any reason justice may require. See *Commonwealth* v. *Woodward, supra* at 667 (court will ameliorate

---

[10]Here there were two motions for a required finding of not guilty, one at the close of the Commonwealth's case and one at the conclusion of the evidence, and both were denied. We therefore have included in our discussion consideration of the evidence at both times. We agree with the judge's implicit determination that nothing in the defendant's case caused the Commonwealth's case to deteriorate. *Commonwealth* v. *Basch*, 386 Mass. 620, 622 & n.2 (1982).

injustice caused by Commonwealth, defense counsel, jury, judge, or interaction of several causes). We note that in his decision to reduce the verdict, the judge stated that he thought murder in the second degree was more in keeping with case law. The judge relied on two cases involving the death of a child, one where the court reduced the verdict under G. L. c. 278, § 33E, *Commonwealth* v. *Cadwell,* 374 Mass. 308 (1978), and one where the court refused to do so, *Commonwealth* v. *Avellar,* 416 Mass. 409 (1993). While it is true that the facts in this case are not similar to the facts in the *Avellar* case, where the defendant delivered repeated blows to the infant's head and there was evidence of numerous other injuries to the infant's body, neither are the facts similar to the *Cadwell* case. In the *Cadwell* case, the court reduced the verdict to murder in the second degree where the fatal blow was administered by the defendant's *hand* in an attempt, however misguided, to discipline the child. Moreover, this case does not contain any other factors that have justified a reduction in verdict in other cases. See *Commonwealth* v. *Lyons, supra* at 291-292, and cases cited. Accordingly, after having reviewed the entire record in this case, we conclude that there is no reason to exercise our power to grant relief under G. L. c. 278, § 33E.

The order reducing the verdict is vacated, the defendant's conviction of murder in the first degree on the theory of extreme atrocity or cruelty is reinstated, and the case is remanded for sentencing.

*So ordered.*