COMMONWEALTH vs. RICHARD MOLINA.

Essex. March 6, 2009. - July 10, 2009.

Present: MARSHALL, C.J., IRELAND, COWIN, CORDY, & GANTS, JJ.

*Homicide. Evidence,* Exculpatory, Cross-examination, Credibility of witness,
Fingerprints, Opinion. *Constitutional Law,* Self-incrimination. *Witness,*
Self-incrimination, Credibility, Admonition by judge. *Practice, Criminal,*
Capital case, Discovery, Jury and jurors.

At a murder trial, the defendant failed to demonstrate prejudice arising from a
delay in the disclosure that a Commonwealth witness had been providing
information unrelated to this case to a State police drug unit both before
and after the murder, where, because a voir dire of that witness was conducted
after the late disclosure, trial counsel was prepared for cross-examination
with more information than he would have had with a timely disclosure,
and where the defendant did not explain how receiving the information
earlier would have affected his preparation of the case. [236-237]

There was no merit to the criminal defendant's claim that he was denied his
constitutional right to a fair trial because a Commonwealth witness had
been forced to testify in violation of his right not to incriminate himself,
where the defendant lacked standing to assert such a claim on behalf of
that witness; moreover, the nature of the witness's testimony was such that
he could not incriminate himself through his testimony, and the record
reflected that the witness repeatedly stated that he was not asserting his
right not to incriminate himself. [237-239]

In the circumstances of a murder trial, there was no merit to the claim that the
judge's admonition of a witness to answer truthfully invaded the province
of the jury or pressured the witness into giving the prosecution's side of
the story. [239-240]

There was no merit to a criminal defendant's claim that a witness's testimony
should have been excluded because it lacked indicia of reliability. [240-241]

At a murder trial, the defendant failed to demonstrate prejudice arising from
the late disclosure that a State trooper had amended his log with handwrit-
ten notations regarding prints found at the crime scene, where the defend-
ant was able to cross-examine the trooper about his failure to produce a
copy of his amended log. [241-243]

At a murder trial, a lay witness did not offer an expert opinion in stating that
he observed that the edges of a knife blade that police found in one loca-
tion fit a knife handle found in another location, and in any event, the
judge's specific, immediate instruction to the jury that the witness was not
giving, and could not give, an expert opinion whether the blade came from
the handle was sufficient to cure any potential misunderstanding. [243-244]

This court declined to exercise its power under G. L. c. 278, § 33E, to reverse
a conviction of murder in the first degree and either order a new trial or
dismiss the case. [244]

INDICTMENT found and returned in the Superior Court Department on December 9, 1998.

The case was tried before *Howard J. Whitehead, J.*

*Janet H. Pumphrey* for the defendant.

*Kenneth E. Steinfield,* Assistant District Attorney, for the Commonwealth.

IRELAND, J. The defendant was convicted of murder in the first degree by reason of extreme atrocity or cruelty of the victim, who was stabbed, strangled, and run over by a van. The defendant appealed, arguing that he was denied his Federal and State constitutional rights where (1) trial counsel did not learn until the fourth day of trial that a key prosecution witness was a confidential police informant; (2) the judge failed to exclude that witness's testimony; (3) trial counsel did not have the proper copy of a forensic expert's report for his cross-examination; and (4) a witness was allowed to testify to his opinion concerning one of the murder weapons. He also asks us to exercise our power pursuant to G. L. c. 278, § 33E. Because we conclude that none of the defendant's claims of error requires a reversal of his conviction and discern no reason to grant § 33E relief, we affirm his conviction.

*Facts and background.* We recite the essential facts the jury were warranted in finding, reserving certain details for our discussion of the issues raised.

Despite the defendant's assertion to the contrary, the defendant and the victim knew each other. The exact nature of the relationship between the defendant and the victim was not clear, but the jury were warranted in concluding it concerned money or drugs or both. The victim had been to the defendant's home at least once. Moreover, around the time of the murder, a telephone call was placed from the apartment where the defendant resided in Lawrence to the victim's residence.[1]

On October 19, 1998, while the victim was driving back from a trip to New York in a Dodge Caravan van he had rented, he made two telephone calls to the defendant's cellular telephone at 7:13 P.M. The victim telephoned the defendant's number again

---

[1]On October 21, 1998, during the course of the murder investigation, a State trooper noticed what turned out to be the telephone number of the defendant's residence on the telephone caller identification box at the victim's residence.

that evening at 10:06 and 10:59 P.M.; the latter call lasted up to three minutes.

Sometime after 11:30 P.M. on October 19, the victim, who still was driving the rental van, met with the defendant and another individual, Anibal Rodriquez.[2] The defendant and Rodriquez murdered the victim in Lawrence, near the back of a grocery store parking lot sometime between the hours of 11:30 P.M. on October 19 and 12:30 A.M. on October 20.

Rodriquez drove the van, which had the victim's body in the back seat, to Methuen and abandoned it near a farm. He went to the home of a woman who lived approximately one-half mile from the farm and asked her for a ride to Lawrence. She did not know Rodriquez and noticed that he was distraught. Ultimately, she telephoned for a taxicab, which picked up Rodriquez in Methuen and dropped him off near the defendant's residence in Lawrence. The taxicab driver noticed that Rodriquez was nervous, that he had blood on his hand and a mark on his neck, and that there was blood on the fifty dollar bill Rodriquez used to pay the fare.

When police examined the van on the afternoon of October 20, they saw the victim's body, as well as a large amount of blood in the front and back seats. The medical examiner testified that the victim had been stabbed multiple times, including five times in the chest and once in the abdomen, any one of which could have been fatal. He also was strangled with a cord or rope, which also could have been fatal. There was a blunt force injury to the victim's head, and he had been run over by the van. The victim was alive during at least part of the strangulation. He had trauma to his mouth and jaw line consistent with resisting the strangulation, as well as defensive knife wounds on his arms. The medical examiner testified that the victim died of multiple stab wounds. Moreover, the stab and strangulation wounds were consistent with, respectively, a knife blade and electrical cord that were found, with blood on them, during the police investigation of the murder site in Lawrence. The blood on the knife blade matched the victim's.

---

[2]In a separate trial, Anibal Rodriquez was convicted of murder in the first degree of the victim by reason of felony-murder. His conviction was affirmed by this court. See Commonwealth v. Rodriquez, ante 215, 216 (2009).

A bloody fingerprint from a right middle finger that was found on a knife handle located in the van, and a bloody partial right palm print that was found on the air bag area of the van's steering wheel, belonged to the defendant. The defendant left his prints because he had the victim's blood on his hand, and a test of the defendant's hands on October 26 showed the presence of blood on the defendant's right palm. Rodriquez's bloody fingerprint was found on the van's exterior driver's side mirror. Moreover, the knife handle found in the van matched the knife blade that was found in Lawrence.

In addition to the physical evidence, a witness, Miguel Valentin, testified that, two or three days before the murder, the defendant approached him and asked whether he wanted to make "three and a half," which the witness assumed meant three and one half grams of drugs or a sum of money. Valentin stated that the defendant related a plan to meet with a "guy." The defendant would sit in the front passenger seat of this man's vehicle, the defendant's girl friend would sit in the rear passenger seat, and Valentin would sit behind the driver. The defendant wanted Valentin to put a wire around the driver's neck. Valentin refused the defendant's request. When Valentin learned about the murder, he went to a State trooper, for whom he had been a confidential informant for approximately ten years, and related the story.

At trial, the Commonwealth prosecuted the defendant for murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty both as a principal and a joint venturer. In rendering their verdict of murder in the first degree based on extreme atrocity or cruelty, the jury were not required to indicate whether they believed the defendant to be the principal or joint venturer.

The defendant called no witnesses at trial. In essence, the defense was that there was no evidence that the defendant was present in the van during the murder. In closing argument, defense counsel conceded that the defendant was associated with the van and the knife handle but argued that the experts could not say when the defendant was in the van, and whose blood was on the knife handle. Defense counsel also attacked the credibility of Valentin, pointing out that he was a drug user and seller, and earned money as a confidential police informant. Counsel detailed incon-

sistencies in Valentin's trial testimony, including that he had changed his testimony from one day to the next.

*Discussion.* 1. *Testimony of Valentin.* a. In his requests for discovery from the Commonwealth prior to trial, the defendant asked for evidence of "promises, rewards, or inducements." On the morning of the fourth day of trial, the Commonwealth informed the defense that Valentin had been providing information unrelated to this case to the State police drug unit both before and after the murder.[3] Defense counsel moved for a mistrial, arguing that this undisclosed, exculpatory information affected trial preparation, misled the grand jury, and went to the heart of the defense.

The judge found that the defendant had not shown prejudice. However, the judge allowed defense counsel to interview Valentin's State police contact, which he did through an investigator. The judge also allowed defense counsel to interview Valentin and, when Valentin ultimately refused to speak to defense counsel, the judge held a voir dire so that Valentin could be cross-examined concerning his past and present relationship with State police officials. After the voir dire of Valentin, the judge found that the interview and voir dire provided the defense with more than it otherwise would have had and that defense counsel would be able to "mount an effective cross-examination" of Valentin.

The defendant argues that he was denied his Federal and State constitutional rights to due process of law and a fair trial. There was no error.

Where there is delay in the disclosure of potentially exculpatory evidence that was part of a defendant's general discovery request, "we ask whether the prosecution's disclosure was sufficiently timely to allow the defendant 'to make effective use of the evidence in preparing and presenting his case.' " *Commonwealth* v. *Wilson*, 381 Mass. 90, 114 (1980), quoting *Commonwealth* v. *Adrey*, 376 Mass. 747, 755 (1978). Delay alone does not constitute prejudice. *Commonwealth* v. *Stote*, 433 Mass. 19, 23 (2000). There must be a demonstration of how the information would have aided the defendant in preparing his case. *Id.* at 25, quoting *Commonwealth* v. *Wilson, supra.* Where a defendant is

---

[3]It is not clear in the record the exact date on which the prosecutor learned about this relationship, but the judge found some culpability on the part of the Commonwealth.

able to cross-examine a witness extensively, prejudice is "effectively" removed. *Commonwealth* v. *Stote, supra* at 24, citing *Commonwealth* v. *Costello*, 392 Mass. 393, 398 (1984).

Here, we agree with the judge that, after the voir dire of Valentin, trial counsel was prepared for cross-examination with more information than he would have had without it.[4] See *Commonwealth* v. *Almeida*, 452 Mass. 601, 609-610 (2008), quoting *Commonwealth* v. *Stote, supra* at 23 (court examines whether disclosure allowed defense enough time to use material in preparing and presenting case). The cross-examination of Valentin occurred after the voir dire, two days after the defendant learned of the relationship Valentin had with the State police drug unit and one day after a defense investigator interviewed the State police officer who worked with Valentin. Thus, counsel had time to prepare. See *Commonwealth* v. *Vinnie*, 428 Mass. 161, 175, cert. denied, 525 U.S. 1007 (1998) (no prejudice from Commonwealth's negligence in making belated disclosure of evidence where defendant able to make full use of it). The defendant does not explain specifically how receiving this information earlier would have affected his preparation of the case and did not move for a continuance, thus undermining his assertion that counsel was unable to prepare properly. See *Commonwealth* v. *Marrero*, 436 Mass. 488, 497 (2002).

Moreover, the cases on which the defendant relies are not apt, as this is not a case where the evidence remained undisclosed until after trial. See *United States* v. *Agurs*, 427 U.S. 97, 103 (1976), citing *Brady* v. *Maryland*, 373 U.S. 83 (1963) (rule of *Brady* case applies to situation where information known to prosecution was withheld from defense and discovered only after trial).[5]

b. The defendant next argues that because Valentin's testimony

---

[4]During the voir dire of Valentin, defense counsel represented that his Spanish-speaking investigator had interviewed Valentin some two weeks before, and that Valentin had spoken to her. It is apparent that the relationship with law enforcement was not discovered during that conversation.

[5]The defendant contends that the judge erred in deciding that, where the defendant's request for discovery only asked for "promises, rewards, or inducements," it was a general rather than specific request. See *Commonwealth* v. *Wilson*, 381 Mass. 90, 108-109 (1980) (specific request must "provide the Commonwealth with notice of the defendants' interest in a particular piece of evidence"). This issue is not relevant where, as here, disclosure of evidence,

should have been struck, he was denied his constitutional right to a fair trial. In particular the defendant contends that the judge forced Valentin to testify despite what the defendant argues was Valentin's claim of his right to remain silent under the Fifth Amendment to the United States Constitution; that the judge invaded the province of the jury when the judge, knowing that Valentin had lied during a voir dire, admonished Valentin to tell the truth when he testified; and that Valentin's testimony lacked indicia of reliability. We consider each, in turn.

(i) The judge held a voir dire of Valentin twice. As discussed, the first voir dire was conducted to remedy the Commonwealth's late disclosure of Valentin's relationship with State police. Thus, defense counsel had the opportunity to cross-examine Valentin about that relationship before Valentin testified. A second voir dire was held to determine whether to allow the prosecutor to treat him as a hostile witness because, during his trial testimony, Valentin stated that he did not want to testify, and denied that the defendant said anything to him except whether he wanted to make "three and a half."

We need not belabor the defendant's argument that Valentin asserted his right under the Fifth Amendment, but was forced to testify by the judge. The defendant has no standing to assert such a challenge on behalf of Valentin. See *Commonwealth* v. *Clemente*, 452 Mass. 295, 318 (2008), cert. denied, 129 S. Ct. 1329 (2009), citing *Commonwealth* v. *Simpson*, 370 Mass. 119, 121 (1976).

Moreover, we agree with the judge that, because Valentin's testimony was that he refused to take up the defendant's offer to get in the car with a "guy," he could not incriminate himself through his testimony. Cf. *Commonwealth* v. *Borans*, 388 Mass. 453, 456-459 (1983) (witness convicted of perjury in grand jury proceeding had right to remain silent at trial of another where witness would have to testify to other matters for which he had

although delayed, occurred before the end of trial. See *Commonwealth* v. *Tucceri*, 412 Mass. 401, 404-408 (1992) (affirming distinction between specific and general discovery requests where evidence is undisclosed until after trial).

Although the defendant states the judge found that the question of prejudice was "close," the judge found that the question whether Valentin's role as a confidential informant was exculpatory was "not black and white."

not been but could be indicted). In any event, the record fully supports the judge's finding that Valentin's repeatedly stating that he did not want to testify was not based on a Fifth Amendment privilege, but on fear for his family. The judge appointed an experienced counsel, who spoke Spanish, to represent Valentin because Valentin requested it.[6] The attorney consulted with Valentin before the first voir dire, during the first voir dire, during his trial testimony, and during the second voir dire. The attorney told the judge that Valentin was not asserting a Fifth Amendment privilege at least twice. Valentin himself told the judge that he was not asserting a Fifth Amendment right. There was no error.

(ii) At the end of the second voir dire, because Valentin was being untruthful when he denied testifying before the grand jury in this case, the judge instructed him about the penalty for perjury in a capital case. The judge told Valentin that he could refuse to answer a question if he asserted a Fifth Amendment privilege, but he could not refuse simply to answer a question, even if he was fearful. The judge then stated, "Unless you exercise your right against self-incrimination, you must answer each question put to you truthfully. You may not lie in giving an answer." He concluded by telling Valentin that the penalty for perjury was life in prison.[7]

The defendant argues that, in giving the instruction, the judge invaded the province of the jury because, knowing that Valentin had already lied to the jury, the judge, in effect, "pressured" Valentin to tell the truth. The defendant argues that, in essence, the judge was making a credibility determination of Valentin, concluding that he was lying and warned him not to persist. He further argues that this pressure on Valentin assisted the prosecution and prevented the jury from assessing fairly Valentin's credibility on their own. The defendant's argument has no support in the record.

---

[6]We do not agree with the defendant that the purpose of the first voir dire was to determine whether Valentin had a valid Fifth Amendment privilege. It is true that defense counsel raised the issue at the first voir dire and that the judge discussed it with defense counsel and appointed counsel for Valentin. However, the judge did not err when, the next day, he concluded that he should not have allowed the defendant to raise the issue on behalf of Valentin.

[7]The judge gave Valentin a similar instruction at the conclusion of the first voir dire. At that time, he did not mention perjury.

At the second voir dire, it was undisputed that Valentin lied when he denied testifying before the grand jury. The judge told counsel that he believed he needed to give the instruction not because Valentin lied but because of the integrity of the trial, where Valentin "may already have . . . [been] untruthful" regarding his grand jury testimony. Although he had discussed the reason for the perjury instruction with counsel, Valentin was not present and thus did not know the reason he was receiving the instruction. There is nothing in the record to support the defendant's assertion that Valentin was pressured into giving the prosecution's side of the story. The instruction was proper. A judge may remind a witness of the duty to tell the truth. See *Commonwealth* v. *Britto*, 433 Mass. 596, 612 (2001). See also *Commonwealth* v. *Slaney*, 345 Mass. 135, 141-142 (1962) (judge's discretion to instruct witness about right to refuse to answer questions that could incriminate her); *Sandrelli* v. *Commonwealth*, 342 Mass. 129, 130 (1961) (judge instructing grand jury witness on rights and duties including privilege against self-incrimination).[8]

(iii) The defendant, citing no authority, argues that it was error not to exclude Valentin's testimony because it lacked indicia of reliability. Questions of credibility and weight of testimony are for the jury to decide. *Commonwealth* v. *Ortega*, 441 Mass. 170, 175 n.8 (2004), and cases cited. Here, defense counsel effectively challenged Valentin's credibility during cross-examination. Counsel impeached Valentin's credibility by asking about his numerous drug-related convictions and his relationship with State police concerning any favors he expected related to those convictions. He asked Valentin what he had received as an informant. He got Valentin to admit that his mind could be "frazzled" due to his drug use. Counsel also exposed the contradictions in Valentin's trial testimony where he first testified that the defendant

---

[8]The cases on which the defendant relies to support his argument that the judge's instruction was improper are not apt because, as the defendant himself notes, the cases deal with jury coercion. See *Commonwealth* v. *Connor*, 392 Mass. 838, 844, 847 (1984) (convictions reversed where judge held no hearing to determine whether good cause to discharge deliberating juror); *Commonwealth* v. *Cote*, 5 Mass. App. Ct. 365, 369-370 (1977), S.C., 7 Mass. App. Ct. 150 (1979) (improper for judge to tell jury that it was "inconceivable" that they could find one defendant guilty but not another); *Commonwealth* v. *Rodriquez*, 364 Mass. 87, 97-100 (1973) (setting forth proper instruction to deadlocked jury); *Commonwealth* v. *Rollins*, 354 Mass. 630, 638 (1968) (same).

only asked him if he wanted to make "three and a half" but the next day (after the second voir dire) testified to the other details of the defendant's request for Valentin to put a wire around the driver's neck. Counsel also got Valentin to admit that he had a "tendency to say whatever [was] convenient to [his] purposes." There was no error.

2. *Fingerprint evidence.* A State trooper who had tested the van for fingerprints testified that over ninety latent prints were found inside and outside of the van, sixteen of which were identified as belonging to the victim, the defendant, Rodriquez, and another individual who had accompanied the victim on his trip to New York. He stated that, of the sixteen prints, only three were in blood: the defendant's prints on the knife handle and steering wheel, and Rodriquez's print on the outside mirror casing. He also testified that there were two other prints on the knife handle, but that they were unidentifiable and that the defendant could not be ruled out as their source. Although the trooper had provided the defense with a copy of a log of his findings regarding the prints at the scene, unbeknownst to the defense, the trooper amended his log with handwritten notations indicating which prints were in blood and which were not. The Commonwealth had a copy of the amended log. However, because defense counsel was relying on the first log, on recross-examination, he pressed the trooper regarding how the trooper knew which prints were in blood. The trooper testified that he had it written in his amended log. Defense counsel moved for a mistrial, arguing that he conducted his cross-examination based on the wrong document and it made him "look like a fool in front of the jury." Although the judge agreed that if defense counsel had had the proper document, he would not have pressed the point on his recross-examination, the judge denied the oral motion for a mistrial. He further stated that defense counsel had not been misled by the Commonwealth into thinking that all prints were in blood. The judge concluded that it could be remedied by cross-examining the trooper concerning his failure to give his amended log to the defense.

In his recross-examination of the trooper, defense counsel elicited that the trooper knew that he had an obligation to provide a copy of the amended log to the defense and knew that it was against the rules to testify without giving the defense a copy.

Defense counsel moved again for a mistrial. The judge reiterated that the defense had not been misled by the Commonwealth. The judge denied the motion, concluding that the defendant's claim of prejudice was speculative, and that the Commonwealth likewise had been embarrassed.

The defendant argues that he was denied his due process right to a fair trial as well as the right to counsel where the Commonwealth attempted to "interfere with," "neutralize," and "sandbag" defense counsel.

Although the defendant has recast this issue as an attempt to interfere with counsel, the claim is one of a late disclosure of evidence that requires the defendant to show prejudice. *Commonwealth v. Wilson*, 381 Mass. 90, 114 (1980) ("we ask whether the prosecution's disclosure was sufficiently timely to allow the defendant 'to make effective use of the evidence in preparing and presenting his case' "). See *Commonwealth v. Stote*, 433 Mass. 19, 23 (2000) (delay alone does not constitute prejudice).

The defendant's reliance on *United States v. Cronic*, 466 U.S. 648, 662 (1984), to argue that he need not show prejudice is unavailing. In the *Cronic* case, the United States Supreme Court held, in dictum, that where an attorney had provided no assistance, prejudice could be assumed in certain circumstances. Here, trial counsel provided adequate assistance. *Commonwealth v. Schand*, 420 Mass. 783, 797 n.15 (1995) (*Cronic* dictum not applicable where trial counsel's performance adequate).

The defendant has not made a showing of prejudice where defense counsel was permitted to cross-examine the witness about his failure to produce a copy of his amended log. See *Commonwealth v. Stote, supra* at 24, citing *Commonwealth v. Costello*, 392 Mass. 393, 398 (1984) (where defendant able extensively to cross-examine witness, prejudice is "effectively" removed). The judge did not abuse his discretion in concluding that the embarrassment to the Commonwealth that resulted from defense counsel's cross-examination of the witness remedied any possible harm to the defense. See *Commonwealth v. Bryant*, 447 Mass. 494, 503 (2006) (decision to declare mistrial within judge's discretion); *Commonwealth v. Jaime*, 433 Mass. 575, 579 (2001), quoting *Commonwealth v. Medeiros*, 395 Mass. 336, 351 (1985) (defendant bears heavy burden of proving that "no conscientious

judge, acting intelligently, could honestly have taken the view expressed by him").

3. *Opinion evidence.* A forensic scientist who worked in the State police crime laboratory examined the knife handle (found in the van) and the knife blade (found at the murder scene) to establish whether there was a physical link between the two items. After defense counsel objected to the witness giving his opinion about whether the two pieces matched, the judge held a voir dire. The judge then ruled that the witness could testify concerning what he did in putting the two items physically together, but could not give his opinion that they matched because the jury were capable of drawing their own conclusion.

The part of the witness's subsequent testimony, to which the defense counsel objected, occurred when, in reference to a photograph of the knife handle and blade, the witness stated, "[A]s a result of closely matching these two broken areas [between the knife handle and the knife blade] I was able to form what I would describe as a direct mechanical match; it's simply like putting two pieces of a jigsaw puzzle together. A perfect fit existed." In response to an objection, the judge asked the witness whether by "mechanical match" he meant that "a jutting out spot connected to an indented spot [on the two pieces of the knife]." After the witness responded affirmatively, the judge instructed the jury that "the witness is not opining, and would not be allowed to opine . . . whether or not this blade, in fact, came from this handle. That would be for you to determine, based upon the evidence. But, he is saying, as indicating, a jutting out spot on one matches an indentation spot on another."

The defendant argues that this was an expert opinion and it was prejudicial error to allow it in evidence because the jury could determine for themselves whether there was a match.

Lay witnesses are allowed to testify only to facts that they observed and may not give an opinion on those facts. *Commonwealth* v. *Millyan*, 399 Mass. 171, 183 (1987). We do not agree with the defendant that the witness offered an expert opinion. He did not say that the knife blade and handle had once been physically attached; rather, he stated that he observed that the edges of the two pieces fit. In any event, the judge's specific, immediate instruction to the jury that the witness was not giving, and could

not give, an opinion whether the blade came from the handle was sufficient to cure any potential misunderstanding. The jury would have understood that it was for them to decide the relationship between the knife blade and handle as a fact from the evidence. See *Commonwealth* v. *Auclair*, 444 Mass. 348, 360 (2005), and cases cited (judge's specific instruction to jury corrected prosecutor's statement; jury presumed to follow judge's instruction). Moreover, the jury had as exhibits the photograph of the two pieces of the knife that shows that the two pieces fit together, as well as the actual knife handle and knife blade, so that they could make their own determination.[9]

4. *Review pursuant to G. L. c. 278, § 33E.* The defendant requests that, pursuant to G. L. c. 278, § 33E, we reverse his conviction and enter an order granting him a new trial or dismissing the case, or grant other relief. He argues that if we disregard Valentin's testimony, there is only a single fingerprint tying him to the murder, and that a single fingerprint is insufficient evidence to convict him. Notwithstanding the fact that Valentin's credibility was the province of the jury and that a single fingerprint in the victim's blood is sufficient evidence to convict the defendant, *Commonwealth* v. *Townsend*, 453 Mass. 413, 416 (2009); *Commonwealth* v. *Morris*, 422 Mass. 254, 257 (1996); *Commonwealth* v. *LaCorte*, 373 Mass. 700, 703 (1977), the defendant ignores the other evidence that ties him to the murder. We have reviewed the entire record and the defendant's claims of error pursuant to our obligation under G. L. c. 278, § 33E, and discern no reason to grant the defendant's request for relief.

*Judgment affirmed.*

---

[9]We also note that, in closing argument, the prosecutor stated only that the knife blade was consistent with the handle. In his final instructions, the judge told the jury that they were the "exclusive judges" of the facts, and that they would decide "what value an exhibit deserves" and whether they would "believe or disbelieve what an exhibit purports to show."