## COMMONWEALTH vs. JEROME McNULTY.

Essex. May 7, 2010. - November 18, 2010.

Present: MARSHALL, C.J., COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Homicide. Assault and Battery by Means of a Dangerous Weapon. Constitutional Law,* Assistance of counsel, Admissions and confessions, Voluntariness of statement. *Evidence,* Admissions and confessions, Voluntariness of statement. *Practice, Criminal,* Capital case, Assistance of counsel, Admissions and confessions, Voluntariness of statement.

This court concluded that where police did not convey adequately to a criminal defendant, who was in custody, the substance of his attorney's telephone message (i.e., that the attorney wanted to speak with the defendant, and that the attorney would arrive shortly at the police station where the defendant was being held) and advice (i.e., that the defendant should not talk to the police), the defendant's subsequent indication that he would continue to speak to the police did not constitute a knowing or intelligent waiver of his Miranda rights, and as a result, evidence of his statements and his actions in connection with the police interrogation that were made after his attorney tried to contact him should have been suppressed. [314-318] CORDY, J., concurring. GANTS, J., dissenting.

Where the police, in violation of a criminal defendant's right to counsel under art. 12 of the Massachusetts Declaration of Rights, did not convey adequately to the defendant, who was in custody, the substance of his attorney's telephone message and advice, the erroneous admission in evidence at trial of the defendant's subsequent statements and actions was not harmless beyond a reasonable doubt with regard to the indictment charging murder, in that the improper evidence had a real potential to weaken or even undermine the defendant's efforts to present himself as a mentally and emotionally impaired man suffering from posttraumatic stress disorder who, at the relevant time, overreacted to a perceived threat, dissociated from what was going on, and was unable to think or act rationally about how to extricate himself from the danger he perceived [318-324]; on the other hand, the erroneous admission of such evidence was harmless beyond a reasonable doubt with regard to the indictments charging assault and battery by means of a dangerous weapon, an offense requiring the Commonwealth to prove only a general intent to commit the act causing the battery, but not a specific intent to injure the victim [324-327].

Discussion of issues that might arise at the retrial of an indictment charging murder in the first degree. [327-330]

INDICTMENTS found and returned in the Superior Court Department on April 18, 2001.

A pretrial motion to suppress evidence was heard by *David A. Lowy*, J.; the cases were tried before *Howard J. Whitehead*, J., and a motion for a new trial, filed on January 8, 2007, was heard by him.

*Sharon Fray-Witzer* for the defendant.

*Kenneth E. Steinfield*, Assistant District Attorney, for the Commonwealth.

BOTSFORD, J. The defendant, Jerome McNulty, appeals from his conviction of murder in the first degree, G. L. c. 265, § 1, as well as from two convictions of assault and battery by means of a dangerous weapon (a knife), G. L. c. 265, § 15A.[1] He also appeals from the denial of his motion for a new trial. We conclude that the defendant's right under art. 12 of the Massachusetts Declaration of Rights to be informed by the police of his attorney's attempts to provide assistance was violated. See *Commonwealth* v. *Mavredakis*, 430 Mass. 848, 859-860 (2000) (*Mavredakis*). We further conclude that the error in admitting in evidence the defendant's entire, signed statement to the police was not harmless beyond a reasonable doubt in relation to the conviction of murder in the first degree. We therefore reverse that conviction and remand that portion of the case for a new trial. We affirm the convictions of assault and battery by means of a dangerous weapon, but remand for sentencing.

1. *Procedural background.* Before trial, the defendant moved to suppress the statement he made to the police during a custodial interrogation following his arrest, claiming violations of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and art. 12. After an evidentiary hearing, a judge in the Superior Court (motion judge) denied the motion. The defendant was tried before a jury and another Superior Court judge (trial judge) in February, 2004. He filed a timely notice of appeal from his convictions and, while his direct appeal was pending, he filed a motion in this court seeking a new trial. We remanded the motion to the Superior Court for disposition. On December 7, 2007, after a nonevidentiary hearing, the trial judge denied the motion; the judge also denied the defendant's motion for discovery of police procedures. The defendant filed

---

[1] The defendant was found not guilty on an indictment charging armed assault with intent to murder, G. L. c. 265, § 18 (*b*).

a timely notice of appeal from the denial of these posttrial motions, and that appeal has been consolidated with his direct appeal from his convictions.

2. *Factual background.* a. *Death of Linda Correia and injuries to AlexSandra Correia and Heather Colahan.* We summarize facts that the jury could have found at trial, leaving recitation of other facts for discussion in connection with the issues raised on appeal. On March 28, 2001, Linda Correia was one of the defendant's girl friends. She lived in a second-floor apartment in Salem with her two children, AlexSandra, aged ten, and Edward, aged eight; her sister, Maureen; Maureen's children, Tatiana, aged six, and Adriana, aged four; and Maureen's friend, Heather Colahan.[2] The defendant lived in Lynn with Lisa Bowen, his "baby's mother," but frequently stayed overnight in Linda's bedroom.

On the night of March 28, after Maureen left for her 11 P.M. to 7 A.M. work shift, present in the apartment were Colahan; Colahan's boy friend, Georgie Sanchez; Maureen's boy friend, Gustavo "Black" Reyes; three of the children, AlexSandra, Tatiana, and Adriana (Edward was not present); Linda; and the defendant. The latter two were in Linda's room "bagging" marijuana and cocaine. At 5:30 A.M. the next morning, March 29, Maureen telephoned to wake Sanchez and Reyes, who were starting new jobs with a temporary employment agency, and both men left the apartment at about 5:45 A.M.

Shortly before 7 A.M., Colahan woke to the sound of "banging" coming from Linda's bedroom. When the noise became louder, she banged on Linda's door, and heard Linda faintly scream and cry, "Help me. He's trying to kill me." Colahan was unable to open the locked door. The noise also woke AlexSandra. She retrieved a butter knife and tried to open the lock with it (something she had previously done), but was unsuccessful. Colahan continued to bang on Linda's bedroom door and screamed, "Open the door. Do you want me to call the police? Let me in."

At that point, the defendant unlocked the door, and came out

---

[2]Because Linda Correia; her children, AlexSandra and Edward Correia; her sister, Maureen Correia; and Maureen's children, Tatiana and Adriana Correia, all share the same surname, we refer to them by their first names.

of the room wearing a blood-soaked shirt and holding a black-handled knife. His face was expressionless. He slashed Colahan in the face and in the area of her back and upper shoulders, slashed AlexSandra in her upper thigh, and then went into the kitchen. Colahan ran from the apartment seeking assistance, and telephoned the police.[3]

Both before and after the defendant left Linda's room, Alex-Sandra heard her mother crying and calling for help. Holding her cousin Tatiana (Adriana remained asleep), she looked into the bedroom and saw her mother's foot on the floor. After the defendant left the apartment through the back door, located in the kitchen, AlexSandra shut the back door, inserting knives into it to keep it closed. She then went into her mother's bedroom, finding her lying on her back. There was blood on her body and on the carpet. Linda was conscious, and again asked for help. AlexSandra stayed for a few seconds, then went to the kitchen and took the telephone from Tatiana, who had just dialed 911.[4] When emergency personnel arrived, Linda was still conscious.

The responding police officers found a "flip knife" and two other knives in the bedroom; two knives outside Linda's bedroom; and a knife just outside the apartment, on the threshold of the front door. Other knives also were found on the kitchen floor, or had been used to wedge the kitchen door shut.

After leaving the apartment, the defendant, covered with blood, walked down the street and entered the premises of the temporary employment agency through which Sanchez and Reyes had just begun employment. He told the manager that he had just been mugged, and wanted a taxicab. Instead of sitting down, however, the defendant lay on the floor, below the level of the windows. The manager became suspicious, and told the defendant to wait outside. When he heard sirens, the defendant pulled up his hood and walked away from Linda's apartment. The manager alerted a police officer in a cruiser, and the defendant was apprehended soon thereafter.

Linda was taken to a hospital. She underwent surgery in an

---

[3]The Commonwealth introduced and played a recording of Colahan's 911 call at trial.

[4]The Commonwealth also played a recording of the girls' 911 call at trial. Only AlexSandra testified at trial.

attempt to repair the wounds to her neck, but died about ten hours after surgery. She had been stabbed or cut eleven times, including four times on the left side of her neck, and had four defensive "cutting wounds" on her left hand, left arm, and left shoulder. She also had multiple bruises. Ultimately, she died as the result of blood loss from the destruction of blood vessels, in particular the carotid artery, jugular vein, and anterior thyroid artery.

b. *The defendant's custodial statement.*[5] Following the defendant's arrest shortly after 7 A.M. on March 29, 2001, he was taken to the Salem police station for booking. All his clothing was seized during the booking process, and he was given a blanket to wear. The defendant was read Miranda rights within fifteen minutes of arriving at the station, and again around 9 A.M., when he agreed to speak to Sergeant Dennis Marks of the State police and Detective James Page of the Salem police.

During the interview, Marks wrote down the defendant's words as he spoke. According to the defendant's statement as memorialized by Marks, at about 5:50 A.M. on March 29, the defendant spoke with Sanchez and Reyes in the apartment kitchen, and told them he was going to visit his mother in a hospital. When he returned to Linda's bedroom, he lay down on the bed and the two started talking. Linda seemed to be "aggravated mad," and got progressively louder and angrier. She got up, pulled a black bag or pocketbook from under the bed, and took out a "ball like white package." The defendant thought it was cocaine, but vigorously declined Linda's offer to give him some. Linda snorted the cocaine using a card.

The defendant then left the room, went to the kitchen to get a soda, and returned. When he got back, Linda was "a different person," and apologized to him. Then, as he sat on the end of the bed and began dressing, she started hitting him, "like a clinging hit," and then asked him to hold her. At that point, she reached over his shoulder and stabbed the night table beside the bed with a knife "like a butterfly with a dragon on it." She

---

[5]The facts stated in this section are taken from the findings of the Superior Court judge who heard the defendant's motion to suppress (motion judge). The motion judge's findings and the defendant's custodial statement, as well as additional facts relating to them, are discussed in more detail, *infra.*

then started swinging the knife at him. Once, she caught him in the hand and he fell, grabbing a blanket. Linda ended up on top of him, and it seemed to him as though she was trying to stab him. They rolled off the bed onto the floor, the blanket was tangled "everywhere," and Linda screamed when they fell. There was a lot of blood, the defendant was not sure whether it came from him or her, and Linda continued to wrestle with him.

When the defendant got up to leave, Linda had another knife, and she "jump[ed] up" and continued to try to wrestle. He heard Colahan knock on the door, and Linda told Colahan to "get out, run, leave, like I was doing something to Linda." When the defendant opened the door, Colahan had a kitchen knife in her hand, yelling at him to leave. Linda came out of the room swinging a knife, and Colahan was pointing a knife at his chest and face. He "smacked" the knife out of Colahan's hand, then saw AlexSandra and Tatiana in the living room and told them to telephone 911. The defendant walked through the kitchen and left through the back door of the apartment to call for help. He went into the temporary employment agency and asked them to call an ambulance. Then, he heard sirens and went outside to look for the police.

After a fifteen-minute break in the custodial interview, the defendant further told the police that he had not smoked marijuana the night before and did not "do" cocaine. He stated he had drunk five or six ounces of rum the previous night, which just made him tired but had no other effect. He denied having had a knife in his hand and denied knowing how the drugs he was carrying when arrested came into his possession, but stated that they were in the same container that Linda had taken from under the mattress in her room.

c. *The defendant's testimony at trial.* The defendant testified at trial. His account of what happened on the night of March 28 into the morning of March 29 was similar to the statement he gave the police, except that he testified that during the night he was using cocaine, smoking marijuana "blunts," and drinking quite heavily. He also testified that, in reaction to Linda's use of knives, he swung wildly, afraid for his life. While he did not remember slashing or stabbing any of the three victims, he agreed that he must have done so.

d. *The defendant's experts' testimony.* The defendant called two expert witnesses to testify concerning his posttraumatic stress disorder (PTSD) and its impact on his behavior on the early morning of March 29, 2001. Dr. Charles Debring, a neuropsychologist, testified generally about PTSD as a disorder recognized in the Diagnostic and Statistical Manual of the American Psychiatric Association (DSM-IV) and affecting some people who have experienced significant traumatic events. Debring described clusters of PTSD symptoms, including reexperiencing the trauma, avoidance, and hyperarousal in reaction to a perception of danger. He also testified about a series of psychological tests he had administered to the defendant. He opined that the pattern shown by the defendant's test results were typical or consistent with PTSD. The second witness, Dr. Robert Joss, a forensic psychologist, had interviewed the defendant on three separate occasions. Joss opined that the defendant had PTSD, stemming from a childhood trauma the defendant experienced when his best friend was kidnapped and murdered as a child, and that the defendant would overreact to a threat such as someone threatening him with a knife, with the consequence that he would engage in "flight or fright [*sic*] behavior" lacking rational control. Joss further opined on the effect of the defendant's PTSD:

> "[H]e over perceived the threat [from Linda] that may have been there, acted in a manner to extricate himself as best he could and in so doing caused her death. And then in his extrication from the apartment, he was confronted with two individuals who were between him and the exit."

2. *Claimed violation of right to assistance of counsel.* a. *Additional background.* The defendant challenges on appeal the denial of his motion to suppress his statement to Sergeant Marks and Detective Page. In his motion, he claimed that the police had obtained his statement in violation of his right to the assistance of counsel protected by art. 12 as interpreted in *Mavredakis,* 430 Mass. at 859-861, and also that his statement was not voluntary. We summarize the motion judge's findings of fact regarding the claimed *Mavredakis* error, according them deference absent clear error, and referring to other evidence as necessary to provide

context for the discussion.[6] We make constitutional assessments based on those facts independently. *Commonwealth* v. *Diaz,* 453 Mass. 266, 272 (2009).

At approximately 9:12 A.M. on March 29, 2001, the defendant's custodial interview with Sergeant Marks and Detective Page began. Before the interview, the defendant again was read Miranda rights, and was asked to acknowledge whether he understood the rights. Marks wrote down the defendant's statements as he spoke. The group took a break from approximately 10 A.M. until 10:15 A.M., during which time the defendant was given a soda and a cigarette. The interview resumed at 10:15 A.M.

At 10:27 A.M., Attorney Raymond Buso was appointed by the Committee for Public Counsel Services to represent the defendant and began driving from the South Boston Division of the Boston Municipal Court Department to the Salem police station. According to Buso's telephone records, Buso telephoned the Salem police station at 10:31 A.M.,[7] and identified himself as the defendant's attorney. Officer Patricia Murphy, who answered the telephone, neither confirmed nor denied the defendant's presence, even though she had been the booking officer. Murphy transferred Buso's call into Detective Sergeant Prosniewski's voice mail. Prosniewski was the public information officer for the police department. Buso telephoned the police department a second time at 10:34 A.M., after disconnecting from Prosniewski's voice mail, reached Murphy, and explained to her that he needed to speak to a "live body." Murphy transferred him to Officer Baglioni. Baglioni was acquainted with Buso. Although Baglioni confirmed the defendant was at the station, he told Buso that he needed to speak to Sergeant Griffin, and gave Buso a different telephone number. Over the next four or five minutes, Buso attempted to reach that number. When he eventually got through to Griffin at 10:42 A.M., he identified himself as counsel for the defendant and told Griffin that he wanted to speak with his client. Griffin confirmed that the defendant was at the station, but told Buso that he could not speak to the defendant at that

---

[6]We separately discuss the defendant's voluntariness challenge. See part 4.a, *infra.*

[7]Although the motion judge found that Buso first contacted the Salem police station at 10:32 A.M., Buso's telephone records indicate otherwise, and there is no dispute on appeal that the contact occurred at 10:31 A.M.

time. Buso asked Griffin "to tell the defendant not to talk to the police and that he would be there shortly"; Griffin said, "O.K." Before relaying any message, however, Griffin called the first assistant district attorney. Griffin was advised to inform the defendant that counsel had been appointed and wanted to speak to him, and that the defendant could end the interview and speak to counsel if he wanted to.

At approximately 10:45 A.M., Griffin relayed this message to Marks and Page outside the interview room. By this time, the defendant had finished his statement and the officers were reviewing it with him. Marks told the defendant that Buso had been appointed to represent him; that the defendant could stop speaking to the officers and speak to Attorney Buso at that time or could keep speaking to them; and that it was his choice. The defendant stated that he wished to keep speaking to the officers. Marks memorialized what he had conveyed to the defendant about counsel on the piece of paper on which he was writing the defendant's statement and, at 10:52 A.M., the defendant acknowledged through his signature "that the statement accurately reflected what he had been told concerning Attorney Buso." Between 10:52 A.M. and 11 A.M., Marks read the entire statement to the defendant. At approximately 11 A.M., the defendant signed each page of Marks's handwritten notes, acknowledging the written words were his statement.

Buso arrived at the Salem police station about 11 A.M. He identified himself as counsel for the defendant, and asked to speak to the defendant "right away." About three or four minutes later, Griffin met with Buso. Although Buso asked to speak with the defendant, Griffin denied the request, stating that "he had informed [the defendant] that an attorney had called and that he had passed the message on that I asked him to, and that [the defendant] wished to continue talking." It was not until about twenty minutes after his arrival at the police station that Buso was permitted to speak to the defendant, which was about fifty minutes from the time he had first contacted the Salem police department. The motion judge found that while the police should have been "more aggressive" in responding to Buso's inquiries, the police had not been "purposefully dilatory."

Based on these findings, the motion judge ruled that Sergeant

Griffin was obligated, once he had spoken to Buso at 10:42 A.M., to inform the defendant immediately of Buso's attempts to offer assistance, rather than contacting the first assistant district attorney. See *Commonwealth* v. *Vao Sok*, 435 Mass. 743, 753 (2002). The judge, however, concluded that the information conveyed to the defendant at 10:45 A.M. about Buso's appointment and availability satisfied the requirements of *Mavredakis*. Accordingly, the judge concluded that because nothing of substance transpired between 10:42 A.M. and 10:45 A.M., the error did not prejudice the defendant and did not require suppression of any part of the statement. The judge denied the defendant's motion to suppress.[8]

b. *Analysis.* In *Mavredakis*, this court held that under art. 12, when an attorney representing a suspect held in custody makes it known to the police that the attorney is seeking to reach his or her client to provide legal advice, the police have an affirmative duty to inform the suspect immediately of the attorney's efforts. *Mavredakis, supra* at 859-860. Failure to do so ordinarily requires suppression of statements made by a defendant thereafter, because the prior waiver becomes " 'inoperative' for further admissions." *Id.* at 861, quoting *Commonwealth* v. *McKenna*, 355 Mass. 313, 324 (1969). The principles outlined in *Mavredakis* have been part of our law for many years. See *Commonwealth* v. *Sherman*, 389 Mass. 287, 296 (1983) (police failure to inform defendant of attorney's request to be present "vitiated the defendant's waiver of his Miranda rights"); *Commonwealth* v. *McKenna, supra* at 323-324 (police failure to inform defendant of attorney's request to be present during

---

[8]The defendant renewed his claim of error under *Commonwealth* v. *Mavredakis*, 430 Mass. 848, 859-860 (2000) (*Mavredakis*), in his motion for a new trial. In ruling on that motion, the trial judge concluded that, under *Mavredakis*, the police were obliged to inform the defendant about Buso's availability at 10:31 A.M., that is, when Buso first contacted the police station. The trial judge agreed with the motion judge, however, that the information about Buso that the police ultimately conveyed to the defendant at 10:45 A.M. met the requirements of *Mavredakis* and, therefore, the error was cured as of that time. In the trial judge's view, because it was impossible to tell exactly what the defendant had stated to the police between 10:31 A.M. and 10:45 A.M., everything the defendant had stated between 10:15 A.M. and 10:45 A.M. should have been suppressed. Nevertheless, he determined that none of the defendant's statements during this half-hour period did or could have made a difference in the outcome of the case, and the error was therefore harmless.

interrogation rendered any previous Miranda waiver by defendant "inoperative"). See also *Commonwealth* v. *Mahnke*, 368 Mass. 662, 691-693 (1975), cert. denied, 425 U.S. 959 (1976) (statements made after police knew defendant's attorney urgently sought to contact principal police officer on case, but did not so inform defendant, properly suppressed as part of prosecution's case-in-chief; statements could be used to impeach defendant if he testified).[9]

The duty to inform described in *Mavredakis* is one that attaches *immediately* after the attorney communicates to the police that he or she represents a suspect in police custody and seeks to communicate with the suspect in order to provide legal advice. See *Mavredakis*, 430 Mass. at 852, 861-862 (defendant's statements made any time after 10:15 P.M., when defendant's first attorney telephoned police station and asked to speak to defendant, should have been suppressed); *Commonwealth* v. *McKenna*, 355 Mass. at 324-325. See also *Commonwealth* v. *Vao Sok*, 435 Mass. at 751, 753 ("when an attorney identifies himself or herself to the police as counsel acting on a suspect's behalf, art. 12 requires the police to stop their questioning and inform the suspect of the attorney's availability immediately"; improper for police lieutenant first to contact assistant district attorney about attorney's attempts to assist defendant rather than directly informing defendant of attempts, but in circumstances of case, error harmless beyond reasonable doubt). Accordingly, in the present case, the failure of the police to inform the defendant of Buso's telephone call immediately after Murphy received Buso's original call at 10:31 A.M. was improper; the trial judge, in deciding the defendant's motion for a new trial, correctly ruled that all state-

---

[9]In the three pre-*Mavredakis* cases cited in the text, *supra*, we did not indicate whether we premised our conclusion "that a suspect's knowledge of an attorney's efforts to render assistance was necessary to effect a knowing and intelligent waiver of . . . Miranda rights" on the Federal or State Constitution. *Mavredakis*, 430 Mass. at 855-856. In *Moran* v. *Burbine*, 475 U.S. 412, 422 (1986), the United States Supreme Court held that there was no duty under the Fifth Amendment to the United States Constitution or any other provision of the Federal Constitution to inform a suspect of his attorney's efforts to give legal representation unless the suspect requested an attorney. Accordingly, in *Mavredakis, supra* at 858-859, we rested our decision on art. 12, pointing out that the Massachusetts Constitution provides greater protection for the individual's right against self-incrimination than that provided by the Fifth Amendment.

ments made by the defendant after 10:31 A.M. should have been suppressed. We also agree with the trial judge that, in the particular circumstances of this case, where there was no way to determine from Sergeant Marks's handwritten memorialization of the defendant's statement exactly what the defendant said between 10:15 A.M. and 10:31 A.M., and what he said between 10:31 A.M. and 10:45 A.M., every statement of the defendant memorialized between 10:15 A.M. and 10:45 A.M. was subject to suppression.

That there was a duty to inform the defendant concerning Buso's efforts to contact him as of 10:31 A.M. leaves open the question what information the police were required to convey. Both the motion judge and the trial judge, in deciding the defendant's motion to suppress and motion for a new trial respectively, concluded that the information conveyed by Marks to the defendant about Buso's message satisfied *Mavredakis* and that the defendant, in stating at some point between 10:45 A.M. and 10:52 A.M. that he would continue to speak with the police after hearing Marks's information, validly waived his right to the assistance of counsel. We disagree.

The obligation, defined in *Mavredakis*, is "to apprise the defendant of a specific communication from his attorney that bore directly on the right to counsel." *Mavredakis, supra* at 861, quoting *State v. Stoddard*, 206 Conn. 157, 169 (1988). Here, according to the motion judge's findings, Buso made four separate points to the Salem police when he ultimately was connected to Sergeant Griffin: (1) he represented the defendant; (2) he wanted to speak to the defendant; (3) the police were to tell the defendant that Buso said not to talk to the police; and (4) Buso would be at the station shortly. In our view, each of Buso's four points related directly to the defendant's right to counsel, see *id.*, and the police here essentially failed to inform the defendant of three out of the four. In particular, as *Mavredakis* makes clear, the statements that Buso had expressly requested to speak to the defendant and would be at the station "shortly" — the second and fourth points — could be of critical importance in "actualizing" the abstract promise of an attorney provided by the Miranda warning into concrete reality; there is a significant difference between being told that one can stop questioning and speak to an appointed attorney, and hearing that the appointed attorney has

already stated that he or she wants to meet and speak, and is in fact due to arrive at one's side "shortly." See *Mavredakis, supra* at 859-860.[10,11]

The third point was also significant — that is, it was critical for the defendant to be told, which he was not, of the specific advice that the identified attorney, Buso, was already giving — namely, that the defendant should not continue to speak to the police. See *Commonwealth v. Vao Sok*, 435 Mass. at 752-753 (in concluding that defendant was adequately informed of his attorney's efforts to render legal assistance, court noted that State police officer informed defendant that defendant's attorney had indicated he [attorney] wanted ongoing polygraph examination terminated, that he was seeking to locate defendant on behalf of another attorney already representing defendant on another case, and that he wanted all questioning of defendant to cease). See also *Commonwealth v. Anderson*, 448 Mass. 548, 552, 556 (2007) (if investigating State police lieutenant had not informed defendant that identified attorney had been appointed to represent him and that attorney had requested defendant not be interviewed, defendant's waiver of assistance of counsel would not have been valid under art. 12 and *Mavredakis*). While the police are not required to "deliver verbatim to a defendant the message given by his attorney," *Commonwealth v. Vao Sok, supra* at 752, Buso's particular message — not to talk to the

---

[10]"[T]here is an important difference between the abstract right to speak with an attorney mentioned in the Miranda warnings, and a concrete opportunity to meet 'with an identified attorney actually able to provide at least initial assistance and advice.' *State* v. *Haynes*, 288 Or. 59, 72 (1979), cert. denied, 446 U.S. 945 (1980). 'Faced with a concrete offer of assistance . . . a suspect may well decide to reclaim his or her continuing right to legal assistance.' " *State* v. *Stoddard*, 206 Conn. 157, 167-168 (1988). *Mavredakis, supra* at 859-860.

[11]The dissent opines that the police officers were not obligated to tell the defendant that his attorney would be at the station to speak to him "shortly" because they had told him already that "he may stop [speaking] to [the police] and speak to [Attorney] Buso *at this time*" (emphasis added) — a statement the dissent takes as indicating that Buso was available "immediately" to speak to the defendant. *Post* at 333. In our view, the quoted language is more ambiguous. Given that the police had *not* given the defendant any information about where Buso then was — all they had said was that Buso had been appointed to represent the defendant — the quoted statement may have been understood as meaning the defendant could cease speaking to the police "at this time" in order to speak to Buso at some future point, such as the defendant's arraignment, when the two would meet.

police — fell within the duty to inform because it "bore directly on the right to counsel." *Mavredakis, supra* at 861.[12]

In sum, we conclude that, because the police did not convey adequately to the defendant the substance of his attorney's telephone message and advice, the defendant's subsequent indication that he would continue to speak to the police did not constitute a knowing or intelligent waiver of the Miranda rights. See *id.* As a result, evidence of all "postbreak" statements made and actions taken by the defendant in connection with the police interrogation — that is, all statements and actions from 10:15 A.M. until the conclusion of the interview at 11 A.M., including the defendant's signing every page of the statement — should have been suppressed. See *Commonwealth* v. *McKenna*, 355 Mass. at 324-325.

Where, as here, the defendant properly objected to the admission of his statement on *Mavredakis* grounds, and the *Mavredakis* errors at issue are constitutionally based, the question we now must confront is whether the admission of the postbreak portions of the statement at trial was harmless beyond a reasonable doubt. See *Commonwealth* v. *Vao Sok, supra* at 753 (preserved *Mavredakis* violations subject to analysis under harmless beyond reasonable doubt standard).[13] See also *Commonwealth* v. *Tyree*, 455 Mass. 676, 701 (2010), quoting *Commonwealth* v.

---

[12]The dissent argues that *Mavredakis* nowhere requires police to inform a suspect of the legal advice that the attorney has asked to be conveyed, and that if we obligate police to do so, we are opening a door that cannot be shut — that we will entangle the police and the courts in difficult, and pointless, debates about which specific pieces of advice need to be passed on, and whether they were passed on correctly. *Post* at 336-337. The dissent's fears are misplaced. The message that Buso sought to have conveyed to his client — not to talk to the police — along with the three other points Buso communicated to Sergeant Griffin, essentially embody the rights already incorporated into the Miranda warnings themselves: the right to remain silent; the right to the assistance of counsel during any custodial interrogation; and the right to stop questioning at any time. Our determination that the police were obliged to convey to the defendant Buso's four points, including the message that the defendant should not talk to the police, does not mean that we are abandoning the view we stated in *Commonwealth* v. *Vao Sok*, 435 Mass. 743, 752 (2002), that exact transmissions of attorney messages in their entirety are not required. However, in *Mavredakis*, we stated that "the duty to inform is only another way of saying that the rights listed in the *Miranda* case are substantively meaningful." *Mavredakis*, 430 Mass. at 860. When the message of the attorney directly incorporates those listed rights, it must be conveyed.

[13]The defendant contends that the court should adopt a "bright line" rule

*Rios*, 412 Mass. 208, 214 (1992) ("We have recognized that a constitutional violation gives rise to presumptive prejudice that can be overcome only where the Commonwealth makes an 'affirmative showing' of harmlessness beyond a reasonable doubt"). To answer the question, "we analyze the case to see whether the error might have had an effect on the jury or contributed to the verdicts, and whether the Commonwealth's evidence was ' "merely cumulative" of evidence properly before the jury,' . . . or was overwhelming without the erroneously admitted evidence." *Commonwealth* v. *Dagraca*, 447 Mass. 546, 553 (2006), quoting *Commonwealth* v. *Sinnott*, 399 Mass. 863, 872 n.8 (1987). See *Commonwealth* v. *Vasquez*, 456 Mass. 350, 361 (2010), quoting *Sullivan* v. *Louisiana*, 508 U.S. 275, 279 (1993) ("The inquiry 'is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error' ").

(i) *Murder conviction.* As to the conviction of murder in the first degree, we cannot say the error was harmless beyond a reasonable doubt under this standard.

This court has delineated a number of factors that bear on the determination whether a trial error involving improperly admitted evidence is harmless beyond a reasonable doubt.[14] The

and order a new trial, without considering whether admission of the portions of the statement taken in violation of *Mavredakis* was harmless beyond a reasonable doubt. We decline to do so.

In this case, as indicated, the motion judge found that there had been no intentional police misconduct. Nevertheless, delays in communicating the availability of counsel of such length as found in this case are troubling. We encourage and expect police departments to establish appropriate protocols for handling requests by counsel to provide legal assistance to a client who is being held in police custody.

[14]It may be useful to describe specifically "the improperly admitted evidence" at issue here. That evidence included everything that Sergeant Marks wrote down after 10:15 A.M., as well as the defendant's signatures on each of the four pages of Marks's notes. What Marks wrote after 10:15 A.M. was the following:

"10:15 resume

"I do smoke marijuana, but I didn't have any last night. I don't do cocaine. I had [around] 5-6 ounces of Capt. Morgan [rum] last night [at around] 2:30 or 3:00. [I]t had no effect on me, except it made me tired.

"I never had a knife in my hand the whole time. The only time I

factors include "(1) the relationship between the evidence and the premise of the defense; (2) who introduced the issue at trial; (3) the weight or quantum of evidence of guilt; (4) the frequency of the reference; and (5) the availability or effect of curative instructions." *Commonwealth* v. *Mahdi*, 388 Mass. 679, 696-697 (1983). See *Commonwealth* v. *Dagraca*, 447 Mass. at 553 (adding to *Mahdi* factors "the importance of the evidence in the prosecution's case").

We begin with the connection between the improper evidence and the premise of the defense. That premise was that while the defendant did in fact kill Linda, in doing so, he did not have the capacity to act with the requisite malice for murder because of his PTSD, and his actions showed he was acting either in lawful self-defense or, at worst, in a manner constituting voluntary manslaughter. The defendant's full statement to the police, however, sets out a version of what happened in the early morning hours of March 29 that clearly could be found to conflict with much of the physical evidence in the case relative to Linda, as well as the testimony of all the other witnesses present in and outside the apartment at the time. Moreover, as a result of the conflict, the jury could view the statement as depicting a man who intentionally, and falsely, was seeking to create a picture

---

touched a knife was when I was trying to get the knife out of Linda's hand. I only touched [Colahan's] knife when I smacked it out of her hand.

"In the bedroom when Linda was on top of me [and] I was trying to grab the knife away from her we both had our hands on the knife. She's trying to hit me with her other hand [and] even tried to bite me a couple of times.

"The drugs that was found on me. I don't have any idea how I got them. They were in the same exact pouch that Linda had taken from under the mattress.

"[signed: Jerome McNulty]

"10:45. advised that [Attorney] Buso has been appointed to represent him. Advised that he may stop talking to us and speak to [Attorney] Buso at this time or may continue to talk to us. It is his choice. Jerome chooses to continue to talk to this officer and Officer Page.

"[signed: Jerome McNulty] 10:52 A.M.

"[initialed: JP; DM]."

of himself as the victim of the violence of others or at least one who had minimal responsibility for the violence that had taken place.

It is true that much of the substance of this self-serving depiction was contained in the prebreak portion of the statement about which Sergeant Marks permissibly could have testified. However, by signing his name to each page of Marks's notes, the defendant effectively adopted the notes in their entirety as his own written "statement." This act, which occurred during the postbreak period, had a number of consequences. First, the presence of the defendant's signature on each page could be understood to add a considered, deliberative quality to the defendant's statement, particularly because the jury could find (based on Marks's testimony) that the defendant only signed each page after the break, after he had "chosen" not to speak to his lawyer, and after he had listened to Marks read the entire statement out loud to him and agreed that it was indeed his statement. The impression that this act could have confirmed was that the defendant's statement was far from a hasty or pressured response to police interrogation, but was instead a considered, thought-out version of events that the defendant wanted to convey.

Second, because of the presence of the defendant's signatures, Marks's writing was admitted in evidence as a trial exhibit, and Marks was permitted to read it verbatim to the jury. See *Commonwealth* v. *Pina*, 342 Mass. 472, 473 (1961). Without the signatures, neither could have occurred. Rather, the Commonwealth would have been confined to introducing Marks's oral testimony about what the defendant had told the police during the prebreak portion of the March 29 interview; the notes themselves would have remained in their untransformed state as simply Marks's notes and, as such, inadmissible. See *Commonwealth* v. *Beaulieu*, 333 Mass. 640, 649 (1956). Cf. *Commonwealth* v. *Brum*, 438 Mass. 103, 114 (2002). Instead, the jurors were provided the *complete* statement — prebreak, postbreak and the portion indicating the defendant was rejecting the assistance of an attorney — in documentary form. We have recognized "the exceptionally potent quality of a defendant's statement or confession," *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 447 (2004), and also that the "potency can only

be magnified when the evidence of that statement or confession is presented by one or more of the interrogating officers." *Id.* The jury here not only heard Marks read the defendant's complete statement word for word, but they were able to review and discuss together every detail of the statement as closely as they chose during their deliberations because it was before them in the form of an exhibit. One may reasonably surmise that jurors are likely to give greater weight to a written document than oral testimony on the same subject, for which they must rely on their memories. See *State* v. *Beckley*, 157 Vt. 446, 450 (1991), quoting *People* v. *Mims*, 204 Ill. App. 3d 87, 93 (1990) (although testimony regarding substance of defendant's confession would be admissible, if defendant's signature on typed confession was "tainted" by improper police promises, document should not be admitted in evidence; "we are concerned by the 'undue weight that jurors may accord the written word, especially when they must rely on their memories alone when considering the oral testimony' "). Cf. *Commonwealth* v. *Avila*, 454 Mass. 744, 756-757 (2009) (error to admit interrogating police officer's notes of witness's statements to police in part because admission created risk that jurors might substitute written notes for collective memory of witness's trial testimony).

Third, the postbreak portions of the written statement, while to some extent cumulative of what the defendant had already said before the break, were far from entirely so. Moreover, some of the differences might well have increased the likelihood that the jury would view the defendant as a liar, a man who would change his story in order to avoid responsibility for his crimes. Thus, the defendant's postbreak comments about not smoking marijuana on the night of the incident, not "do[ing]" cocaine, and only feeling "tired" (not intoxicated) from drinking five to six ounces of rum contradicted the defendant's own trial testimony, and also conflicted directly with information he had provided to Dr. Joss, one of the two expert witnesses on whom the defendant relied at trial to explain his PTSD and its effect on him.[15] And the defendant's explicit, categorical statement, made *only* during the postbreak period, that he "never

[15]The prosecutor emphasized this conflict in her cross-examination of both Joss and the defendant himself, and defense counsel, in his closing argument, conceded that the defendant had lied to the police.

had a knife in my hand the whole time" reemphasized the glaring conflict between the defendant's version of events and what the physical evidence and other witnesses' testimony showed — as the defendant essentially admitted at trial, when he stated he must have used a knife and slashed or stabbed the victims. Finally, the portion of the written statement that described how the defendant declined the offer to speak with his appointed lawyer, and instead chose to continue speaking to the police, could be interpreted by the jury to support a view of the defendant not only as a deliberative prevaricator — a quality suggested by the addition of his signatures to the "statement" — but as one who was also self-confident enough to talk to the police, and construct his story, on his own.

To be sure, the improperly admitted evidence at issue did not include a confession or even an inculpatory admission. Contrast *Mavredakis*, 430 Mass. at 853 (while attorney was waiting in police station, defendant changed from denying to admitting his involvement in shooting); *McKenna*, 355 Mass. at 318-320 (after defendant's attorney had contacted police, defendant admitted participation in crime). However, the defendant's proffered theory of defense focused almost entirely on his mental and emotional condition at the time of the critical events. In that context, the improper evidence had a real potential to weaken or even undermine the defendant's efforts to present himself as a mentally and emotionally impaired man suffering from PTSD who, at the relevant time, overreacted to a perceived threat to his safety arising from the conduct of Linda (as well as the other two victims), dissociated from what was going on, and was unable to think or act rationally about how to extricate himself from the danger he perceived.

Turning to additional factors listed in our cases as relevant to the harmless error analysis, see *Commonwealth* v. *Dagraca*, 447 Mass. at 553; *Commonwealth* v. *Mahdi*, 388 Mass. at 696-697, we think it clear that the defendant's complete, signed statement was significant to the prosecution. It was the prosecution that introduced the statement, through Marks. The prosecutor called Marks as her final witness, and his reading of the entire statement, followed by the admission of the written document as an exhibit, were the capstones of the Commonwealth's case-in-

chief. The prosecutor's cross-examination of the defendant thereafter focused repeatedly on the statement, including the defendant's act of signing it, and she featured the statement as the first topic discussed in her closing argument. As the Commonwealth stated during oral argument before this court, the defendant's full, signed statement was "definitely an important part of the Commonwealth's case." Finally, on the "weight or quantum of evidence of guilt," *Commonwealth* v. *Dagraca, supra,* there was indeed a great deal of evidence that the defendant killed Linda and wounded the other two victims. Given the premise of the defense, however, what is critical is not the quantum of this evidence, but rather the evidence pertaining to the defendant's mental state on the night of March 28 and into the morning of March 29, and concerning what happened between the defendant and Linda while the two were in her bedroom during this time. Little was presented on either topic. As the trial judge remarked to the attorneys, "We just don't know what happened," and, "Here we don't know what the motive is." The principal source of evidence bearing on the defendant's mental state was the defendant's expert witnesses and the defendant himself. Even assuming the jury's disbelief of these witnesses, such disbelief would not create affirmative conflicting evidence. Beyond these witnesses, there was evidence that Colahan had described the defendant as without expression when he came out of Linda's room, and evidence from witnesses who interacted with the defendant at the temporary employment agency that the defendant was acting strangely. Considering all these factors, we cannot say with assurance that the improperly admitted evidence of the defendant's full and signed statement "might [not] have had an effect on the jury or contributed to the verdicts," *id.,* and that it was therefore harmless beyond a reasonable doubt.[16]

(ii) *Convictions of assault and battery by means of a danger-*

---

[16]The Commonwealth accepts the trial judge's conclusion that under *Mavredakis* it was error to admit any evidence of statements made by the defendant between 10:15 A.M., when the defendant was advised about his attorney, and 10:45 A.M. Like the trial judge, however, the Commonwealth adopts the position that the *Mavredakis* error ended at that point, and that accordingly, there was no error in admitting evidence concerning the defendant's signing of the statement — which occurred after 10:45 A.M. — or in admitting the signed

*ous weapon.* The defendant's convictions of two counts of assault and battery by means of a dangerous weapon stand on different ground. As discussed, the "premise of the defense" at trial, *Commonwealth* v. *Mahdi,* 388 Mass. at 696, was that the defendant's alleged PTSD, a mental impairment, rendered him incapable of the malice necessary for murder, and we have concluded that the admission of the entire signed statement was not harmless because it could be viewed as impairing or undermining that defense. While mental impairment is relevant to the murder conviction, which requires proof of a specific intent, see, e.g., *Commonwealth* v. *LaCava,* 438 Mass. 708, 717-718 (2003), it is not relevant to these convictions. Assault and battery by means of a dangerous weapon is a general intent crime and, as such, obligates the Commonwealth to prove beyond a reasonable doubt that the defendant had a general intent to do the act causing the battery, but not that he had a specific intent to injure the victim. *Commonwealth* v. *Appleby,* 380 Mass. 296, 307 (1980). See *Commonwealth* v. *Ford,* 424 Mass. 709, 711 (1997). We do not consider mental impairment (short of a lack of criminal responsibility, which is not claimed here) relevant to the jury's determination whether the defendant was able to form the requisite general intent. See *Commonwealth* v. *Fano,* 400

---

document itself as a trial exhibit. For reasons we have discussed previously, we reject that position.

With respect to the postbreak statements themselves, the Commonwealth contends that their admission was harmless beyond a reasonable doubt because they were merely cumulative of what the defendant had already stated before the break; the statements could have and would have been placed before the jury to impeach the defendant's trial testimony, see *Commonwealth* v. *Mahnke,* 368 Mass. 662, 692-693 (1975), cert. denied, 425 U.S. 959 (1976); and the statements favored the defendant because they supported his self-defense. We also reject these claims. As previously indicated, the postbreak statements were cumulative to some extent, but also provided new, independent, and damaging evidence against the defendant. As for impeachment, any conclusion that the postbreak statements would come in for this purpose is speculative at best, because we cannot know whether the defendant would have chosen to testify if he knew that the admissible evidence of his "statement" would be limited to Sergeant Marks's testimony describing the contents solely of the prebreak portion. Finally, with respect to the evidence being favorable to the defendant, we note that the defendant certainly did not need the postbreak portion of his "statement" to argue a theory of self-defense, and we have difficulty discerning how any aspect of the postbreak portion offered anything of benefit to the defense.

Mass. 296, 305 n.14, 308 n.17 (1987), citing *Commonwealth* v. *Grey*, 399 Mass. 469, 474 (1987) (jury permitted to decide if mental condition "rendered the defendant unable to form the specific intent necessary for the crime of murder, but that finding would not exonerate the defendant from guilt for a crime requiring only general intent"). The defendant has not suggested on appeal that as a result either of his PTSD or intoxication, he was incapable of forming the requisite general intent. While he may not have intended the consequences of touching Colahan and AlexSandra, or while he may have felt threatened in some manner before he struck, there is no suggestion in the evidence that the defendant was not aware of any relevant circumstance or that he did not intend the touching. See *Commonwealth* v. *Ford*, *supra* at 711-712; *Commonwealth* v. *Appleby*, *supra*.

Moreover, the primary focus of the entire statement was on the defendant's actions relative to Linda; his interactions with AlexSandra and Colahan are referenced relatively briefly, and primarily in the portion of the statement that the defendant gave before 10 A.M. — the substance of which was admissible.[17] Indeed, the only postbreak reference in the statement to either Colahan or AlexSandra directly repeats something the defendant had stated prebreak, namely, that he knocked the knife out of Colahan's hand. (There is no postbreak mention of AlexSandra.) See *Commonwealth* v. *Perez*, 411 Mass. 249, 260 (1991). Given the statement's limited references to these victims, we are satisfied that the impact of the defendant's signature on the pages of the statement was equally minimal. Furthermore, independent of the statement, the evidence that the defendant cut or slashed AlexSandra and Colahan was overwhelming. See *id*. at 261. In light of all the circumstances, we are certain that these two convictions were "surely unattributable to the [*Mavredakis*] error," *Commonwealth* v. *Vasquez*, 456 Mass. at 361, quoting *Sullivan*

---

[17]The defendant told the police before 10 A.M. that Colahan was knocking on the door of Linda's bedroom, that when he opened the door she was standing there holding a kitchen knife and pointing it at him while yelling at him to leave, and that he "smacked" the knife out of her hands two times. With respect to AlexSandra, the defendant told the police before 10 A.M. that she was there with her cousin Tatiana, and that he told them to telephone 911 as he left the apartment.

v. *Louisiana*, 508 U.S. 275, 279 (1993), and that, as to those convictions, the erroneous admission of the defendant's complete, signed statement was harmless beyond a reasonable doubt.[18]

4. *Issues that may arise at retrial.* a. *Voluntariness of defendant's statement.* In addition to the *Mavredakis* errors, the defendant claims that the entirety of his statement to the police should have been suppressed, because the Commonwealth could not prove the voluntariness of the statement beyond a reasonable doubt.[19] See *Commonwealth* v. *Auclair*, 444 Mass. 348, 353 (2005). In particular, he contends that at the time of the police interrogation, he suffered from mental illness and humiliation caused by the fact that his clothes had been taken from him and he was covered only by a blanket; he also contends that "misrepresentation [of facts concerning Linda's condition], intoxication, and mental illness" worked to render his statements involuntary.[20] After an evidentiary hearing, the motion judge rejected the claim, concluding:

> "[I]n the totality of the circumstances, the defendant's statements were voluntary as the defendant's will was not '[o]verborne to the extent that his statement was not the result of a free and voluntary act.' *Commonwealth* v. *Selby*, 420 Mass. 656, 662-663 (1995). In the totality of the circumstances surrounding the questioning of the defendant, the police did not make any promises or other inducements. The defendant did not appear to the police to be tired or under the influence of drugs or alcohol, nor did the defendant appear to be emotionally unstable. The defendant was read his complete Miranda rights twice —

[18]In light of our determination that these convictions should be affirmed but that his conviction of murder in the first degree must be reversed, it will be necessary on remand for the defendant to be resentenced; the sentences the judge imposed on these convictions were ordered to run from and after the sentence on the murder conviction.

[19]The defendant again raised the voluntariness claim in his motion for a new trial. In ruling on that motion, the trial judge accepted as correct the motion judge's findings and his ultimate ruling that the defendant's statements were voluntary. We therefore focus on the motion judge's findings and rulings.

[20]It is not clear whether he raised all these factors before the motion judge. To the extent he did not, he may not rely on them as grounds to seek reversal of the motion judge's decision. See *Commonwealth* v. *Silva-Santiago*, 453 Mass. 782, 795 (2009).

once during booking and again in the interview room before questioning began. Furthermore, the defendant indicated that he understood the Miranda rights by the physical voluntary act of signing the Miranda card indicating that he understood his rights."[21]

In reviewing a decision of a motion judge, we accept his findings of fact absent clear error, "and a finding of voluntary waiver is given substantial deference." *Id.* The motion judge was entitled to accept the testimony of the police about the defendant's appearance and level of sobriety, see *Commonwealth* v. *Anderson,* 445 Mass. 195, 204 (2005), citing *Commonwealth* v. *Dunn,* 407 Mass. 798, 803-805 (1990), and to give weight to the repeated issuance of Miranda warnings. See *Commonwealth* v. *Auclair,* *supra* at 355. With respect to the claim that the defendant's level of emotional upset was too great to permit a finding that his Miranda waiver and statements were voluntary, "emotional upset alone does not render a waiver of Miranda rights or the voluntariness of the statement itself invalid where there is no evidence that the defendant was acting irrationally [during the interrogation]." *Id.* See *Commonwealth* v. *LeBlanc,* 433 Mass. 549, 555

---

[21]The motion judge's conclusions quoted in the text are taken from the portion of his decision captioned, "Rulings of Law." The judge's separate factual findings included the following:

"Once in the interview room, Sergeant Marks read the defendant his Miranda rights. The defendant was not in handcuffs and his chair was closest to the door. After each right was read to the defendant, he was asked if he understood that particular right. The defendant indicated after each of the Miranda rights was read that he understood and Sergeant Marks wrote the word 'yes' after each right on the Miranda card after the defendant indicated he understood that particular right. The defendant then signed the Miranda card indicating he understood his rights. . . .

"As the defendant sat in the interview room, Sergeant Marks observed that the defendant seemed scared and upset and he had a cut on one hand. The defendant's mood would change. He was not emotional throughout the interview and at times he even appeared calm. Sergeant Marks observed that the defendant did not appear to be tired or under the influence of drugs or alcohol. Marks knew, however, that the defendant stated that he had consumed some alcohol earlier. Detective Page offered the defendant a cigarette and a soda which the defendant accepted. Sergeant Marks took out a pad of paper and the interview began."

(2001). There was no error in the denial of the defendant's motion to suppress on voluntariness grounds.[22,23]

b. *Admission of autopsy photographs*. The defendant asserts error in the admission of certain autopsy photographs, claiming they were more prejudicial than they were probative. See *Commonwealth* v. *Richmond*, 371 Mass. 563, 565-566 (1976). The photographs in question showed the results of surgery, as well as bruising and swelling from "coagulopathy," a condition caused when the units of blood the victim received did not clot. While we have said that unduly gruesome autopsy photographs present "special problems," *Commonwealth* v. *Bastarache*, 382 Mass. 86, 106 (1980), a trial judge has discretion to admit them in appropriate cases. Despite showing some surgical alterations, the trial judge could properly conclude that what the photographs showed was relevant to the Commonwealth's theory that the defendant acted with extreme atrocity or cruelty.[24] See *Commonwealth* v. *Anderson*, 445 Mass. at 209; *Commonwealth* v. *Keohane*, 444 Mass. 563, 573 (2005).

---

[22]The defendant claimed in his motion for a new trial, but not in his motion to suppress, that his humiliation at being without his clothes was exacerbated by the fact that he was photographed naked before both male and female officers. See *Commonwealth* v. *Collins*, 11 Mass. App. Ct. 126, 131-132 n.4 (1981) (nudity coercive). The motion judge found that the defendant's clothes were removed for evidentiary purposes, and there is no evidence to suggest that the purpose of the photograph was improper, despite the defendant's assertion that the photograph did not help identify him, show relevant marks, or catalog the absence of marks. The existence of the photograph does not alter our view that the motion judge's determination of voluntariness was not erroneous in this case, although the effect of such photographs, and the lack of clothing during a custodial interview, may be factors considered on the question of voluntariness.

[23]The defendant asserts that the exhibit containing his statement was not admissible at trial because it constituted a "denial of guilt in response to accusations . . . , which should have been excluded as indistinguishable from an assertion of the right to silence, even if false." The argument, which was not raised below, fails on its merits in any event. As the Commonwealth argues, and as we have discussed previously, the defendant's statement set out a version of events that attempted to minimize his responsibility for the injuries that the victims sustained; it was not an unequivocal denial of guilt responding to police accusations. Cf. *Commonwealth* v. *Womack*, 457 Mass. 268, 272 (2010); *Commonwealth* v. *Diaz*, 453 Mass. 266, 273 (2009).

[24]This conclusion is aided by the trial judge's limiting instruction to examine the photographs "dispassionately, unemotionally, indeed coldly." See *Commonwealth* v. *Anderson*, 445 Mass. 195, 209-210 (2005).

c. *Admission of 911 call.* The defendant also claims error in the admission over objection of a tape recording of the 911 call initiated by six year old Tatiana in the apartment's kitchen, who was neither a stabbing victim nor a witness at trial. In the recording, Tatiana screamed, "He's killing us," and ten year old AlexSandra told the police that the knife "went right through me." The trial judge expressed reservations about admitting the evidence, because "it's very emotional" and "doesn't tell [us] much," but allowed the recorded call to be played to the jury, finding that it went to the Commonwealth's theory of extreme atrocity and cruelty. While hearing the two children's panicked 911 call to the police may be relevant to Linda's own emotional suffering, and therefore also relevant to the issue of extreme atrocity or cruelty, cf. *Commonwealth* v. *Murphy*, 426 Mass. 395, 402 (1998) (defendant killed victim, his wife, in presence of their two year old son); *Commonwealth* v. *Barros*, 425 Mass. 572, 581 (1997) (defendant killed victim in presence of victim's wife and friend), it is not clear from the record whether Linda, although still alive, was able to hear the call. Absent any such evidence, the recording of the 911 call may well be more prejudicial than probative, and appropriately excluded.[25,26]

---

[25]Contrary to the defendant's argument, admission of this 911 call did not violate *Crawford* v. *Washington*, 541 U.S. 36 (2004). To the extent that Alex-Sandra was the caller, she testified at trial, and thus there could be no confrontation issue. See *Commonwealth* v. *King*, 445 Mass. 217, 236 (2005), cert. denied, 546 U.S. 1216 (2006). Moreover, the trial judge properly could, and did, find that Tatiana was seeking help for an ongoing medical emergency, and did not anticipate that her statements would be used for purposes of prosecution. *Davis* v. *Washington*, 547 U.S. 813, 822 (2006). See *Commonwealth* v. *Simon*, 456 Mass. 280, 298-299 (2010).

[26]The defendant contends the trial judge committed other evidentiary errors at trial, including the exclusion of Raymond Buso's proffered testimony concerning his observations of the defendant when Buso met with him at the police station on March 29, 2001, one half-hour after the end of the defendant's custodial interview with the police; and the exclusion of proffered testimony by the defendant's mother concerning a fight she witnessed between Linda and another girl friend of the defendant. We do not address these claims because it is not clear whether or in what context this evidence might be offered at a retrial. We also do not address the defendant's arguments concerning the prosecutor's closing argument or the jury instructions, because the contents of both are likely to be different at retrial. Finally, the defendant claims that he was entitled to discovery of, and an evidentiary hearing on, police procedures regarding notification of suspects being interrogated when

5. *Conclusion.* The judgments of conviction of assault and battery by means of a dangerous weapon are affirmed. The judgment of conviction of murder in the first degree is reversed, and the verdict is set aside. The case is remanded for a new trial on the murder indictment, and further proceedings consistent with this opinion.

*So ordered.*

CORDY, J. (concurring). I agree that the police in this case did not adequately inform the defendant of his attorney's efforts to render legal assistance. I also agree with the court's careful analysis of why, in the circumstances of this case, the admission of the defendant's "postbreak" statements was not harmless. I write separately to express my view that the inadequacy lay in the police not informing the defendant that his attorney had telephoned, wanted to talk to him, and was on his way to the station. This is information necessary to "actualize" the abstract right to counsel within the meaning of art. 12 of the Massachusetts Declaration of Rights as we have interpreted it in *Commonwealth* v. *Mavredakis,* 430 Mass. 848, 859-860 (2000). I do not agree that the police had any obligation to communicate the substance of any legal advice the attorney may have wanted to convey to his client. In this regard, I agree with Justice Gants that if a suspect wishes to hear his attorney's legal advice before continuing with the interrogation, he may simply ask to do so.

GANTS, J. (dissenting). I agree with the court that, under art. 12 of the Massachusetts Declaration of Rights, once an attorney representing a suspect held in custody tells the police that the attorney wants to speak to his or her client to provide legal advice, the police have an affirmative duty immediately to interrupt the interrogation and inform the suspect of the attorney's efforts to provide legal advice. See *Commonwealth* v. *Mavredakis,* 430 Mass. 848, 859-861 (2000) (*Mavredakis*); *Commonwealth* v. *Vao Sok,* 435 Mass. 743, 751 (2002) (*Vao Sok*).

an attorney contacts the police station on their behalf. In light of our decision, the issue is moot.

Consequently, I agree with the court and the trial judge that this "duty to inform," *Mavredakis, supra* at 860, was triggered by Attorney Raymond Buso's initial telephone call at 10:31 A.M. to the Salem police station. I differ, however, with the court's conclusion that the information the police provided to the defendant at approximately 10:45 A.M. was not sufficient to satisfy the "duty to inform." The police gave the defendant notice that Buso had been appointed to represent him; that he could stop talking to the police and speak to his attorney "at this time"; or that he could continue to speak with the police. I believe that the "duty to inform" is a "duty to inform a suspect of an attorney's efforts to render assistance." *Id.* I do not believe, as the court concludes today, that the duty includes a duty to inform the suspect of the attorney's legal advice. Because I conclude that the police ultimately satisfied the "duty to inform" and that the defendant, having been so advised, knowingly and voluntarily waived his right to speak to his attorney at 10:52 A.M., I agree with the trial judge that only the defendant's statements made after the break until his waiver need be suppressed, and that the admission of these statements was harmless beyond a reasonable doubt. Therefore, I respectfully dissent.

*Duty to inform.* In *Mavredakis, supra* at 859, we rejected the United States Supreme Court's assumption in *Moran* v. *Burbine,* 475 U.S. 412 (1986), that "information regarding the immediate availability of an attorney has no bearing on a suspect's ability knowingly and intelligently to waive Miranda rights." We concluded that "there is an important difference between the abstract right to speak with an attorney mentioned in the Miranda warnings, and a concrete opportunity to meet 'with an identified attorney actually able to provide at least initial assistance and advice.' " *Mavredakis, supra,* quoting *State* v. *Haynes,* 288 Or. 59, 72 (1979), cert. denied, 446 U.S. 945 (1980). "Essentially, the duty to inform a suspect of an attorney's efforts to render assistance is necessary to actualize the abstract rights listed in *Miranda* v. *Arizona,* 384 U.S. 436 (1966)." *Mavredakis, supra* at 860.

In *Vao Sok, supra* at 751-752, we clearly informed police what they must do to satisfy the "duty to inform":

"[W]hen an attorney identifies himself or herself to the

police as counsel acting on a suspect's behalf, art. 12 requires the police to stop their questioning and inform the suspect of the attorney's availability immediately. . . . If the suspect accepts the attorney's offer of assistance, the police must suspend questioning until the suspect consults with the attorney. . . . We acknowledged in *Mavredakis*, however, that a suspect may choose to decline the attorney's offer. . . . To this extent, an attorney's directive to the police to stop questioning the defendant requires only that they terminate questioning long enough to afford the defendant the opportunity to avail himself of the attorney's advice." (Citations omitted.)

The police here complied with that guidance. They stopped their questioning of the defendant and informed him that Buso had been appointed to represent him, and that he may stop talking to the police and speak to his attorney "at this time," or continue to speak with the police. The court concludes that the police "essentially failed" to inform the defendant that Buso "wanted to speak" to him and that the attorney "would be at the station shortly." *Ante* at 316. The police, however, owe no obligation to tell a suspect that his attorney "wants" to speak with him; they are required merely to inform him that his attorney is available to speak with him. See *Vao Sok, supra* at 751-752. Nor can the police be faulted for failing to tell the defendant that his attorney "would be at the station shortly" where they told him that he could speak to his attorney "at this time," which suggested that the attorney was available immediately to speak with him.[1]

The court also concludes that the police "essentially failed" to inform the defendant "of the specific advice that the identified attorney, Buso, was already giving, namely, that the defendant should not continue to speak to the police." *Ante* at 316-317.

---

[1]The court suggests that, when the police told the defendant that "he may stop [speaking] to [the police] and speak to [Attorney] Buso at this time," the defendant may have understood this to mean that he would be able to speak to his attorney for the first time at his arraignment. *Ante* at 317 n.11. No reasonable defendant would have given that statement such a meaning. "At this time" means "now," which is less ambiguous and sooner than the information the attorney gave to the police that the court concludes should have been forwarded — that he would be at the station "shortly."

While the court recognizes that the police are not required to "deliver verbatim to a defendant the message given by his attorney," *ante* at 317, quoting *Vao Sok, supra* at 752, the court now requires the police to inform a defendant of the substance of the "specific advice" that the attorney asked the police to pass on to the defendant. The court appears to believe that this is not a new addition to the "duty to inform," but it is. The court has never before declared that the "duty to inform" includes a duty to communicate an attorney's specific legal advice to a suspect.

The court finds support in three cases for adding a duty to communicate the attorney's legal advice to the "duty to inform," but none actually provides such support. First, the court quotes the language in *Mavredakis* that "the duty [the court] announce[s] concerns solely the obligation 'to apprise the defendant of a specific communication from his attorney that bore directly on the right to counsel.' " *Mavredakis, supra* at 861, quoting *State v. Stoddard*, 206 Conn. 157, 169 (1988). But this assertion in *Mavredakis* did not mean that the police had an obligation to pass on the legal advice the suspect's attorney wished to convey; the specific communication from the two attorneys in *Mavredakis* asked simply to speak with the defendant. *Mavredakis, supra* at 852-853.[2] Moreover, this assertion in *Mavredakis* came in response to the Commonwealth's argument that the "duty to inform" "would create administrative difficulties"; it was intended to emphasize the *limited* nature of the duty, and to clarify that the court did not "mean that the police have a duty to provide information such as the 'nature and quality of the evidence' that the investigation has amassed against the suspect."[3] *Id.* at 860-861, quoting *Oregon* v. *Elstad*, 470 U.S. 298, 317 (1985).

Second, the court cites *Vao Sok, supra* at 752, where, in finding the defendant's waiver of his right to counsel to be valid,

---

[2]Nor did the attorney in *State* v. *Stoddard*, 206 Conn. 157, 161 (1988), ask the police to pass on legal advice; he simply told the police he wanted to speak with his client.

[3]The Supreme Court of Connecticut, *State* v. *Stoddard, supra* at 169, used the following language to respond to a similar argument: "The police conduct at issue in this case . . . consists not of a failure to supply generally useful information but of a failure to apprise the defendant of a specific communication from his attorney that bore directly on the right to counsel."

we noted that the police had told the defendant that an attorney had said he did not want the polygraph test to continue, that he was attempting to locate the defendant on behalf of the defendant's attorney, and that he wanted all questioning of the defendant to end. The issue in *Vao Sok* was whether the defendant's waiver was invalid because the police did not tell the defendant that *his own* attorney had wanted to speak with him and be present for any further questioning. *Id.* In concluding that the duty to inform had been satisfied, we did not focus on the transmission of the other attorney's legal advice but on the transmission of information regarding "the availability of an identifiable attorney," concluding that the defendant "was made aware not only that an attorney was attempting to assist him, but that he could stop the questioning and speak with a specific attorney if he so wished." *Id.* Moreover, as noted earlier, in *Vao Sok* we specifically defined the "duty to inform," and that duty did not include a duty to communicate an attorney's legal advice. *Id.*

Third, the court cites *Commonwealth* v. *Anderson*, 448 Mass. 548 (2007), where the police told the defendant before commencing the interrogation that Attorney Bruce Ferg was going to represent him on an indictment for murder and that the attorney wished he not speak to anyone. *Id.* at 552. We concluded that the defendant's waiver of his right to consult with counsel and to have counsel present before speaking to the police was intentional, knowing, and voluntary, but added that the waiver might not have been knowing and intelligent under art. 12 if the police had not fully informed the defendant of his attorney's entry into the case and the attorney's request that the defendant not be interviewed. *Id.* at 555-556. This dictum does not suggest that we intended to amend the duty to inform by adding a duty to communicate an attorney's legal advice.

Three circumstances in *Anderson* are not commonly found in cases that raise the so-called *Mavredakis* issue: the defendant initiated the interview; the defendant was already under indictment for the crime about which he was questioned; and the defendant was serving a State prison sentence in Maine, where the interview occurred. *Commonwealth* v. *Anderson*, *supra* at 552-553, 555. In addition, Ferg had not been told that the police were going to visit the defendant at the Maine prison, *id.* at 552,

and the police did not inform the defendant that Ferg was available to speak with him. Rather, the police told the defendant that Ferg had been assigned to represent him on the charge under indictment, and that Ferg was advising the suspect not to speak to the police about that charge. In these circumstances, where the duty to inform as defined in *Vao Sok, supra* at 751-752, had not been satisfied, the court reasonably considered the totality of the circumstances, including Ferg's advice that the suspect should not speak to the police, in deciding that the suspect's waiver of his right to counsel was knowing and voluntary.

The duty to inform was meant to be a straightforward "bright-line rule," *Mavredakis, supra* at 860, requiring only that the police inform a suspect of an attorney's availability, but its bright line will be dulled if it includes a duty to inform a suspect of the attorney's legal advice. Once the court opens that door, it cannot be assured that the legal advice an attorney will ask to be forwarded will always be as simple as "don't speak to the police." It potentially could include advice as to what the client should do or say if he intended to disregard the attorney's advice to remain silent, or what subjects the client should not discuss. Do the police owe a duty to inform a suspect of all legal advice provided by the attorney? What if the police incorrectly relayed some of that legal advice? The court has not before needed to address these questions because of the limited scope of the duty to inform; the court will soon need to now that it has expanded that scope to include a duty to communicate legal advice.

The court ably characterizes my fears regarding the new requirement that the police inform a suspect of the legal advice that the attorney has asked to be conveyed — the court "will entangle the police and the courts in difficult, and pointless, debates about which specific pieces of advice need to be passed on, and were they passed on correctly" — but concludes that my fears are "misplaced" because the only legal advice that must be conveyed is advice that "essentially embod[ies] the rights already incorporated into the Miranda warnings themselves: the right to remain silent; the right to the assistance of counsel during any custodial interrogation; and the right to stop questioning at any time." *Ante* at 318 n.12. This supposed limitation does not assuage my fears where the court provides no guidance to the police (or a judge

considering a motion to suppress) as to what it means for legal advice to "essentially embody" the rights provided in the Miranda warnings. Because of this ambiguity, the police risk the suppression of a confession whenever they fail to convey all the legal advice that counsel asks to be conveyed.

Nor is there any logical reason to expand the scope of the duty to inform to include the communication of legal advice. If a suspect wishes to hear the attorney's legal advice before continuing with the interrogation, he may simply ask to do so. Where he knowingly and voluntarily chooses not to hear it, why would art. 12 require that he be told it anyway?

*Harmless error analysis.* The court concludes that, "because the police did not convey adequately to the defendant the substance of his attorney's telephone message and advice, the defendant's subsequent indication that he would continue to speak to the police did not constitute a knowing or intelligent waiver of the Miranda rights." *Ante* at 318. Therefore, the court concludes that all the statements the defendant made after the break at 10:15 A.M., including the statements made after the waiver of his right to counsel, were admitted in error. Because I conclude that the police belatedly complied with the duty to inform, I believe that the defendant's waiver was knowing and intelligent, and that the only statements admitted in error were those made after the break at 10:15 A.M. and before his waiver of counsel at 10:52 A.M. This disagreement is critical to the harmless error analysis because the court's conclusion that the admission of the defendant's statements made after the break at 10:15 A.M. was not harmless beyond a reasonable doubt rests heavily on the defendant's "postbreak" adoption of the statements he made before the break by signing his name to each page of Sergeant Marks's notes. If I am correct, the defendant's adoption of his earlier statements was properly admitted, and the harmless error analysis should focus on those few statements the defendant made after the break and before his waiver of the opportunity to speak with attorney Buso. With that narrower focus, I agree with the trial judge that the erroneous admission of that evidence was harmless beyond a reasonable doubt.

Between the break and the waiver of his opportunity to speak with attorney Buso, the defendant made eight statements that

were admitted in evidence at trial. The first three concerned his sobriety on the night of the homicide:

1. The defendant did not smoke marijuana that night.

2. The defendant does not "do cocaine" but does smoke marijuana.

3. At 2:30 or 3 A.M., he had five to six ounces of rum but it had no effect on him other than to make him tired.

The final five concerned the defendant's memory of what happened that night:

4. He never had a knife in his hand on the night of the killing.

5. He touched a knife only when he tried to grab the knife out of the homicide victim's hand when she was on top of him.

6. He smacked a knife out of Heather Colahan's hand.

7. The homicide victim tried to hit the defendant with her other hand and even tried to bite him a couple of times.

8. He had no idea how he got the drugs that were found on him, which were in the same pouch that the homicide victim had taken from under the mattress.

As to his memory of the events that night, statement 4 could be inferred from what the defendant told the police before the break, but was stated more clearly after the break. In his testimony at trial, however, the defendant specifically said that he did not remember holding the knife, so the jury heard this information from him directly.[4] The fifth, sixth, and seventh statements were cumulative of what the defendant told the police before the break. The eighth statement had not been made to the police before

---

[4]Dr. Robert Joss, a defense expert, testified at trial that the defendant initially had told him that he did not know where the knife was and did not see it, but in a later interview admitted handling the knife. However, on cross-examination at trial, the defendant denied telling the police that he never had a knife in his hand during the incident.

the break. However, at trial, the defendant on cross-examination admitted that the pouch was one of several that the homicide victim kept under the mattress; he denied saying that this particular pouch had been taken from under the mattress. The difference in these two versions is inconsequential to the issue of his criminal responsibility. The only information that the jury heard from the eighth statement alone was the defendant's assertion that he had no idea how he obtained the drugs in the pouch, but this statement, too, was inconsequential because the Commonwealth did not claim that theft of the drugs was a motive for the killing.

As to the defendant's drug use, this information was not elicited prior to the break and contradicted his testimony at trial, where he testified that he *had* used cocaine and marijuana that evening. However, the postbreak statements matched what he initially told Dr. Robert Joss, the defense expert who opined that the defendant suffered from posttraumatic stress disorder on the morning of the homicide. On cross-examination at trial, Dr. Joss testified that the defendant initially told him he had not used marijuana or cocaine before his arrest, but later admitted to smoking five or six "blunts" that night and trying "lines" of cocaine.[5] Consequently, even without the admission of the post-break statements, the jury would have learned from Dr. Joss that the defendant had contradicted himself as to his prior drug use.[6]

In assessing whether the admission of these statements was harmless error beyond a reasonable doubt, we ask "whether, on the totality of the record before us, weighing the properly admitted and the improperly admitted evidence together, we are satisfied beyond a reasonable doubt that the tainted evidence did not have an effect on the jury and did not contribute to the jury's verdicts." *Commonwealth* v. *Tyree*, 455 Mass. 676, 701 (2010). Because the erroneously admitted statements made by the defendant between the break and the waiver of his opportunity to speak with Buso were cumulative either of statements made

---

[5] The jury were not limited in their use of Dr. Joss's testimony regarding the prior statements the defendant made to him during his forensic interviews.

[6] The jury also learned about the defendant's drinking of rum during the cross-examination of Dr. Joss, who testified that the defendant told him that he had drunk six or seven "rums" that evening, and drank the rum directly out of the bottle.

before the break or of information learned by the jury during the testimony of Dr. Joss and the defendant, I am satisfied that the error was harmless beyond a reasonable doubt.[7]

For these reasons, I respectfully dissent.

---

[7]I have also considered whether there is a reasonable doubt the defendant would have called Dr. Joss to testify or whether the defendant himself would have testified at trial if these statements had been suppressed before trial. I am convinced beyond a reasonable doubt that the suppression of these statements would not have altered the defense's trial strategy in this regard. The gist of the defense was presented by Dr. Joss when he was asked his opinion as to the effect of the defendant's posttraumatic stress disorder at the time of the killing: "[H]is situation was such that he over perceived the threat that may have been there, acted in a manner to extricate himself as best he could and in so doing caused her death." I conclude that this opinion was so central to the defense that no reasonable defense attorney would have opted to forgo Dr. Joss's testimony to prevent the jury from learning of the defendant's contradictory statements regarding his drug use at the time of the incident.